**Rinaldo DEL GALLO, III, Plaintiff**

v.

**Roger PARENT, et al., Defendants.**

**C.A. No. 06–30063–MAP.**

United States District Court, D. Massachusetts.

March 28, 2008.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Pittsfield Post Office.

*MEMORANDUM AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTIONS FOR MISCELLANEOUS RELIEF* (Dkt. Nos. 31, 35, 38, and 39)

PONSOR, District Judge.

## I. INTRODUCTION

Anthony Lewis, in the first line of the introduction to his magnificent book, *Free-dom for the Speech We Hate: A Biography of the First Amendment,* observes that "[o]urs is the most outspoken society on earth." This case probes the proper boundaries of that outspokenness in the nitty-gritty context of a highly local dispute, in the light of authority provided by a sharply divided Supreme Court. *See United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

*Pro se* Plaintiff Rinaldo Del Gallo, III, is from time to time a candidate for political office. Defendants, Postmaster Robert Parent and the Pittsfield Post Office, have applied a postal regulation to prohibit Plaintiff from soliciting signatures in support of his political candidacy from the sidewalk owned by the United States Postal Service and immediately adjoining the post office entry. Citing the First and Fourteenth Amendments to the United States Constitution, Plaintiff seeks declaratory and injunctive relief barring Defendants from persisting with this prohibition.

Defendants have moved for summary judgment on the grounds that (1) the sidewalk in question is a non-public forum as a matter of law, (2) the postal regulation prohibiting solicitations related to a political campaign on the postal sidewalk is a reasonable time, place and manner restriction, and (3) the undisputed record confirms that Defendants have enforced the regulation in a manner that is viewpoint-neutral, in the sense that it is not aimed at the content of Plaintiff's speech.

Plaintiff opposes Defendants' motion and has filed his own motion for summary judgment. According to Plaintiff, the sidewalk at issue is a traditional public forum for First Amendment activities both as a matter of fact and law. Alternatively, Plaintiff contends that, even if the sidewalk were a non-public forum and the postal regulation at issue passed constitu-

tional muster, he would still be entitled to judgment as a matter of law based on Defendants' selective enforcement of that regulation arising from their distaste for his political views.

Plaintiff has also filed a motion for a "temporary injunction," and a motion to permit the filing of a late request for an admission. Defendants have not filed any formal opposition to these motions, though their motion for summary judgment implicitly opposes the request for immediate injunctive relief.

The description of the background of this case and the explication of the legal analysis will require some time. In the end, however, the result will be driven by the only reasonable construction of *Kokinda*. That decision, addressing a parallel postal regulation prohibiting solicitation of "alms and contributions" upon a postal sidewalk substantially identical to the one in this case, produced a plurality opinion with four justices finding that the area was a "non-public forum" and a separate concurrence by Justice Kennedy holding that, regardless of the identification of the forum, the restriction on solicitation in that case was reasonable. 497 U.S. at 737–39, 110 S.Ct. 3115. Despite vigorous and impressive efforts by this *pro se* litigant, no legally cognizable distinction can be wrought between this case and *Kokinda*.

For the reasons set forth below, the court will deny Plaintiff's motion for summary judgment (Dkt. No. 31), allow Defendants' motion for summary judgment (Dkt. No. 35), deny Plaintiff's motion for a temporary injunction (Dkt. No. 38), and deny Plaintiff's motion to permit the filing of a late request for an admission (Dkt. No. 39).

## II. BACKGROUND

### A. The Regulatory Scheme.

In many towns and cities the local post office provides an ideal locale for citizens to meet their neighbors for lobbying, solicitation, and political canvassing. The effort by postal authorities to balance patron access and convenience against First Amendment expression has generated a maze-like pattern of evolving regulations.

The best place to begin an overview of this unfolding regulatory scheme is in 1970, when Congress passed the Postal Reorganization Act, Pub.L. 91–375, 84 Stat. 719 (1970) (codified at 39 U.S.C. §§ 201 *et seq.*), establishing the United States Postal Service ("Postal Service") as an independent entity within the federal government's executive branch. According to Frederick Hintenach, the Manager of Postal Customer Service Operations in Washington, D.C.,

> the Postal Service is not supported by tax dollars. Instead, the Postal Service is funded by the revenue it generates from its operations.... Because of the Postal Service's need to generate its operating revenue through the sale of its products and services, customers are vitally important to the Postal Service's business. Thus, Retail Operations must strive to furnish the highest quality customer service possible by providing customers easy access to its products and services.

(Dkt. No. 36, Ex. 2, Hintenach Decl. ¶¶ 4, 6.)

The Postal Service has promulgated regulations governing conduct on postal property in the Federal Register. Pursuant to 39 C.F.R. § 232.1(h)(1),

> Soliciting alms and contributions, *campaigning for election to any public office,* collecting private debts, soliciting and vending for commercial purposes (including, but not limited to, the vending of newspapers and other pub-

lications), displaying or distributing commercial advertising, *collecting signatures on petitions*, polls, or surveys (except as otherwise authorized by Postal Service regulations), are prohibited.

39 C.F.R. § 232.1(h)(1) (2007) (emphasis added).

The predecessor to this provision, 39 C.F.R. § 232.6(h)(1),[1] did not prohibit campaigning on postal property. *See* Miscellaneous Amendments, 37 Fed.Reg. 24,346, 24,347 (Nov. 16, 1972). The Postal Service added this ban in 1978 to "prevent abuses and to preclude any appearance of partisan endorsement or preference." Conduct on Postal Property, 43 Fed.Reg. 38,824, 38,824 (Aug. 31, 1978); *see also* Conduct on Postal Property, 42 Fed.Reg. 63,911, 63,911 (Dec. 21, 1977) (calling the proposed restriction "consistent with existing regulations prohibiting the display on bulletin boards" of anything "designed to influence [an] election"). According to Hintenach, the campaigning prohibition "covers all aspects of political activity, including soliciting signatures to place a candidate's name on an election ballot." (Hintenach Decl. ¶ 9.)[2]

On June 28, 1998, the Postal Service amended § 232.1(h)(1) by adding prohibitions against "soliciting signatures on petitions, polls, and surveys" and "impeding ingress to or egress from post offices." *See* 39 C.F.R. § 232.1(h)(1) (1999).[3] Defendants contend that this amendment came in response to "widespread customer complaints" concerning "signature-gathering activities on postal property." (Hintenach Decl. ¶ 10.) According to Hintenach,

> The substance of the complaints was that the signature solicitation disturbs and impedes customers' use of the postal facilities and, thus, access to postal services. Also, until the enactment of the broader ban on signature solicitation, postmasters ... had the difficult task of determining whether ... a given signature solicitation involved campaigning for election to public office because the campaigning prohibition did not cover signature solicitation for other purposes.

*(Id.)*[4]

The signature solicitation ban gave rise to a lawsuit by proponents of various ballot

1. In 1981, the Postal Service re-designated § 232.6 as § 232.1. *See* Miscellaneous Organizational and Administrative Changes, 46 Fed. Reg. 34,329, 34,330 (July 1, 1981).

2. Plaintiff contends that this assertion is "devoid of supporting proof." (Dkt. No. 45, Pl.'s Surreply to Gov't's Opp'n to Pl.'s Mot. for Summ. J. 2.) He notes the finding of one district court that postal regulations "were silent on the subject of soliciting signatures on postal property" prior to 1998. *Initiative & Referendum Inst. v. U.S. Postal Serv.,* 116 F.Supp.2d 65, 68 (D.D.C.2000). Whatever ambiguities may lie in the history of the regulations, however, the current ban on political campaigning is clear.

3. The Postal Service later "mov[ed] the provision prohibiting blocking ingress and egress from post offices from § 232.1(h)(1) to

§ 232.1(e)." Conduct on Postal Property, 70 Fed.Reg. 72,078, 72,078 (Dec. 1, 2005). That provision now provides:

> Disorderly conduct, or conduct which ... impedes ingress to or egress from post offices, or otherwise obstructs the usual use of entrances, foyers, corridors, offices, elevators, stairways, and parking lots, or ... which otherwise impedes or disturbs the general public in transacting business or obtaining the services provided on property, is prohibited.

39 C.F.R. § 232.1(e) (2007).

4. While Plaintiff maintains that this statement constitutes "unbuttressed rank hearsay" (Pl.'s Surreply to Gov't's Opp'n to Pl.'s Mot. for Summ. J. 2), it is clear that the 1998 amendment was intended to "minimize the disruption of postal business and to provide unimpeded ingress and egress of customers and

initiatives. *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 116 F.Supp.2d 65, 68 (D.D.C.2000) (*"IRI I"*). After the district court allowed the Postal Service's motion for summary judgment, *see Initiative & Referendum Inst. v. U.S. Postal Serv.*, 297 F.Supp.2d 143 (D.D.C.2003) (*"IRI II"*), the Postal Service published a bulletin instructing postmasters that circulators wishing to collect signatures on petitions, polls, or surveys should

> not be prohibited from standing on exterior parts of Postal Service property that are open to the public and passing out informational leaflets, holding up a sign, or both. The leaflet or sign could provide relevant information about the petition, poll, or survey, and direct Postal Service customers to nearby non-Postal Service property ... where they can sign the petition, poll, or survey, if they so desire.

(Dkt. No. 36, Ex. 4, Postal Bulletin 22119 (Jan. 8, 2004).)

When the Circuit Court for the District of Columbia subsequently reversed, *see Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299 (D.C.Cir.2005) (*"IRI III"*), the Postal Service once again amended § 232.1(h)(1), this time by replacing the word "soliciting" with "collecting," *see* 39 C.F.R. § 232.1(h)(1) (2006). According to the Postal Service, the purpose of this amendment was "to clarify that the prohibition against soliciting signatures on postal property refers to the actual collection of the signatures and not to communication that promotes the signing of petitions, polls, and surveys somewhere other than on Postal Service premises." Con-

duct on Postal Property, 70 Fed.Reg. 72,-078, 72,078 (Dec. 1, 2005).

The upshot of these amendments is that persons currently are permitted to come on postal property to pass out issue-oriented, non-political leaflets and request that postal costumers come to locations *off* postal property to sign petitions, polls, and the like. Political campaigning of any kind, however, is still barred.

*IRI III* also prompted the Postal Service to amend 39 C.F.R. § 232.1(a). That provision now provides that the prohibitions set forth in § 232.1(h) do not apply to

> sidewalks along the street frontage of postal property falling within the property lines of the Postal Service that are not physically distinguishable from adjacent municipal or other public sidewalks, and any paved areas adjacent to such sidewalks that are not physically distinguishable from such sidewalks.

39 C.F.R. § 232.1(a)(ii) (2007); *see also* Conduct on Postal Property, 70 Fed.Reg. at 72,078 (noting that "members of the public might not be able to distinguish this type of postal property from municipal or other public property, and thus might not realize that they have entered onto postal property").

Notwithstanding this change to subsection (a), § 232.1(h) remains applicable to

> other types of exterior Postal Service property that are open to the public, including internal sidewalks that are easily distinguishable from the perimeter sidewalks by means of some physical feature, such as sidewalks perpendicular to the perimeter sidewalks ("feeder" sidewalks), sidewalks leading from a

---

employees to and from post offices." Conduct on Postal Service Property, 62 Fed.Reg. 61,481, 61,481 (Nov. 18, 1997) (noting the experience of the Postal Service that solicitation activities "are generally disruptive to postal business"). Ensuring the unimpeded

ingress and egress of postal patrons appears to be the purpose of other postal regulations as well. *See, e.g.,* 39 C.F.R. § 232.1(k)(4) (2007) ("The blocking of entrances, driveways, walks, loading platforms, or fire hydrants in or on property is prohibited.").

postal parking lot to the postal building, and other exterior areas, such as parking lots, porches, patios, and steps.

Conduct on Postal Property, 70 Fed.Reg. at 72,078.

This phase of regulatory evolution meant that citizens would be allowed to engage in First Amendment activity, including political campaigning, on sidewalks adjoining the post office, so long as these areas were indistinguishable from public walkways, even if they in fact belonged to the post office.

Pursuant to 39 C.F.R. § 232.1(q)(2), "local postmasters ... may ... enter into agreements with State and local enforcement agencies to ensure that ... [postal] regulations are enforced." 39 C.F.R. § 232.1(q)(2) (2007). Individuals found guilty of violating § 232.1 are subject to criminal penalties, including fines and imprisonment. 39 C.F.R. § 232.1(p)(2) (2007).

## B.  *The Pittsfield Post Office.*

The Pittsfield Post Office is an L-shaped building located at 212 Fenn Street in downtown Pittsfield, Massachusetts. The west end of the L abuts a grassy margin that separates it from the municipal sidewalk that runs beside Willis Street. The east end of the L extends at a right angle north before stopping at a second municipal sidewalk that abuts Fenn Street.[5]

The main entrance of the building faces Fenn Street across a parking lot. To access it by automobile, motorists turn south off Fenn Street across a portion of the city sidewalk to enter the west end of the parking area. The rectangular parking area fills in the portion of the post office plot not occupied by the post office building itself.[6]

Upon exiting their vehicles, patrons continue traveling south for a few steps, then ascend the curb of the southern portion of a postal service sidewalk that frames the parking lot on three sides. This southern portion of the postal sidewalk runs parallel to the city sidewalk abutting Fenn Street and leads to the front doors of the Post Office. The eastern and western segments run perpendicular to the southern segment and provide a connection between the southern segment and the Fenn Street sidewalk.

To exit the parking lot, motorists back out of their spots, then drive east for a short distance before turning north across a second driveway that traverses another portion of city sidewalk and leads back to Fenn Street.

To access the main entrance of the Post Office from the Fenn Street sidewalk, a pedestrian could follow the path of motorists described above. Alternatively, the customer could avoid the parking lot by turning south onto either of the two feeder segments of the postal service sidewalk that run perpendicular to and connect with the city sidewalk. As noted above, these two segments also run perpendicular to and connect with the portion of the postal sidewalk that leads to the Post Office's front doors.

---

**5.** Attachment A to this decision is a diagram of the exterior of the Pittsfield Post Office, which the parties agreed at oral argument fairly depicts the area. Attachments B–E are photographs of the same. Attachment F is a satellite image of the site obtained through Google.

**6.** Based on the angle of the parking spots depicted in the diagram and photographs provided by Defendants, it appears that the western driveway serves as an entrance and the eastern driveway is the exit. The remainder of this description will proceed on this assumption.

Finally, to access the main entrance from Willis Street, a pedestrian could turn east onto the city sidewalk abutting Fenn Street and follow the path of the pedestrian described above. Alternatively, a short flight of concrete stairs just to the south of Fenn Street offers Willis Street pedestrians a shortcut to the segment of the postal sidewalk that leads to the building's front doors. While one postal employee contends that postal patrons are the only pedestrians who use these stairs (*see* Dkt. No. 49, Ricci Decl. ¶ 8), it is undisputed that any pedestrian traveling north on Willis Street who wanted to turn to walk east on Fenn Street could use these stairs, along with the postal service sidewalk, as a shortcut to avoid vehicular traffic entering and exiting the postal parking lot off Fenn Street.

## C. Facts.

During the spring of 2004, Plaintiff, a candidate for the Massachusetts Governor's Council, attempted to obtain some of the signatures necessary to get his name on the ballot from patrons of the Pittsfield Post Office. (Dkt. No. 23, Del Gallo Aff. 1.)[7] On or about April 21, 2004, James Curley, a Customer Service Supervisor at the Pittsfield Post Office, observed Plaintiff seeking signatures for his campaign from a spot on the southern portion of the postal service sidewalk just outside the building's main entrance. (Dkt. No. 51, Curley Aff. ¶ 3.)

At the request of Paula Cooke, another supervisor at the postal facility, Curley informed Plaintiff that postal regulations prohibited the solicitation of signatures from that location and instructed Plaintiff to move to the municipal sidewalk abutting Fenn Street. (*Id.* ¶¶ 2–3; *see also* Dkt. No. 50, Cooke Aff. ¶¶ 3–4.) When Plaintiff refused to do so, Curley called the Pittsfield Police Department.

Upon their arrival, Pittsfield police officers repeated Curley's instruction. When Plaintiff continued to seek signatures from the postal sidewalk, officers placed him under arrest. (Del Gallo Aff. 1; Curley Decl. ¶ 5.)

Prior to his arrest, Plaintiff contends that

countless candidates for political office ... or people gathering signatures for such candidates ... were allowed to gather signatures at the Pittsfield Post Office. Not one of them was told that they could not gather signatures; the practice went on for generations, and it never impeded the flow of pedestrian traffic into the United States Post Office.

(Del Gallo Aff. 2–3.)

During a second run for Governor's Council in 2006, Plaintiff met Postmaster Parent and asked if he could gather signatures on postal property in light of the *IRI III* decision. (*Id.* at 2.) After conferring with counsel, Parent refused Plaintiff's request and advised him that he would be arrested again if he attempted to gather signatures from the postal service sidewalk. (*Id.*; *see also* Dkt. No. 36, Ex. 1, Parent Decl. ¶ 4.)

On March 27, 2006, Plaintiff and a companion went to the Pittsfield Post Office,

---

**7.** Ronald Ricci, a Supervisor of Customer Service at the Pittsfield Post Office, asserts that Plaintiff also attempted to solicit signatures inside the Post Office lobby during this campaign. (Dkt. No. 49, Ricci Aff. ¶¶ 3, 5.)

These allegations, as well as allegations that Plaintiff harassed postal patrons (*see* Dkt. No.

50, Cooke Aff. ¶ 6), are immaterial to the legal issues before the court. Plaintiff does not contend that he should be permitted to collect signatures from inside the post office, and Defendants do not argue that Plaintiff's conduct violated 39 C.F.R. § 232.1(e).

and the two began collecting signatures while standing on the city sidewalk abutting Fenn Street. At some point, Pittsfield police officers arrived and reminded Plaintiff that he was not to enter onto postal property for the purpose of obtaining signatures. (Del Gallo Aff. at 2.)

In response, Plaintiff asked if it would be permissible for him to *solicit* signatures while standing on the postal sidewalk if he directed persons willing to provide their signatures to his companion, who would remain on the city sidewalk. At the behest of postal staff, the police officers denied Plaintiff's request. (*Id.*)

According to Plaintiff, Defendants' selective enforcement of the postal regulation reflects bias against him based on his activities promoting fathers' rights and opposing gay marriage, as well as his success in a prior First Amendment lawsuit. In support of this charge, he has offered the affidavit of Jonathan Melle, a former candidate for a seat in the Massachusetts state senate. Melle asserts that, beginning in February 2004, he spent approximately six weeks on the postal sidewalk at issue gathering signatures in connection with his campaign. (Dkt. No. 48, Melle Aff. 1.)

Plaintiff has also submitted a declaration from Jonathan Levine, the publisher of *The Pittsfield Gazette*. According to Levine,

> On my trips to the Pittsfield Post Office over the years, I have seen numerous potential candidates for office gathering nomination paper signatures. I have spoken with such candidates on many occasions. I have seen candidates for offices such as school committee, district attorney, mayor, state senator and governor's council solicit signatures.

(Dkt. No. 52, Levine Decl. 1 (noting the presence of "numerous signature gatherers for ballot question initiatives" as well)).[8]

In response, Defendants have filed declarations from three postal workers that offer somewhat inconsistent accounts of the history of signature solicitation at the Pittsfield Post Office. On the one hand, Cooke asserts that she is unaware of any other political candidate who has used the postal service sidewalk to solicit signatures (Cooke Aff. ¶ 8), and prior to Plaintiff's arrest, Curley contends that he witnessed only two (unsuccessful) attempts at electioneering on postal property (Curley Aff. ¶ 1).[9] On the other hand, Ronald Ricci states that,

> I would, on occasion, receive requests from individuals to conduct petitioning or campaigning activity on the property of the Pittsfield Post Office. I would tell such individuals that they could conduct such activity on the sidewalk outside the Post Office.

(Dkt. No. 49, Ricci Decl. ¶ 2.) Apparently, during his first eighteen years as a Customer Service Supervisor, Ricci was unaware "of the Postal Service regulation prohibiting signature solicitation and political campaigning on Postal Service property." (*Id.*) Since learning of this regulation as a result of Plaintiff's arrest, Ricci has informed two candidates for public office

---

8. Although Levine does not expressly state that he witnessed candidates for public office collecting signatures on the postal sidewalk, Defendants concede that individuals were permitted to collect signatures from that location on at least some occasions. (*See* Dkt. No. 49, Ricci Decl. ¶ 2.)

9. While both Cooke and Curley have worked at the Pittsfield Post Office for decades, Cooke is generally unaware of "activities ... on the Post Office sidewalk" (Cooke Decl. ¶ 1), and Curley's "duties do not typically include dealing with the public or managing the lobby" (Curley Decl. ¶ 1).

that they could not solicit signatures on postal property.

### D. *Travel of the Case.*

Plaintiff initially brought this action before a single justice of the SJC. The complaint named Parent, the Pittsfield Post Office, and Pittsfield Police Chief Anthony Riello as Defendants.[10]

Following removal to this court, Plaintiff requested a remand to state court or, alternatively, an immediate hearing on his motion for injunctive relief. In opposing Plaintiff's motion for injunctive relief, Defendants submitted a diagram of the exterior of the Pittsfield Post Office, including adjacent municipal streets and sidewalks. (*See* Dkt. No. 7, Ex. D, Parent Decl., Ex. 1.) This diagram inaccurately depicted the postal service sidewalk as completely cut off from the Fenn Street sidewalk by the postal parking lot and was accompanied by a declaration from Parent stating that the postal sidewalk "solely provides customer access to the Post Office and is not used as a general thoroughfare." (Parent Decl. ¶ 3.)

On April 28, 2006, the court denied injunctive relief finding that Plaintiff had not shown a likelihood of success on the merits. On November 6, 2006, Police Chief Riello filed an unopposed motion for judgment on the pleadings, which the court allowed on November 22, 2006.

On February 21, 2007, Plaintiff submitted an affidavit concerning the topography of the Pittsfield Post Office. (*See* Dkt. No. 24.) In this submission, Plaintiff raised concerns regarding the accuracy of the diagram the Postal Service had previously submitted in opposing his motion for injunctive relief.

On March 19, 2007, Plaintiff moved for summary judgment.[11] On April 24, 2007, Defendants tendered their opposition to this motion and filed their own motion for summary judgment. Notwithstanding Plaintiff's objection as to its accuracy, Defendants attached to their memorandum the same diagram of the Pittsfield Post Office that they had submitted earlier. (*See* Dkt. No. 36, Ex. 1, Parent Decl., Ex. A.)

On April 27, 2007, Plaintiff filed the pending motion for injunctive relief. Plaintiff also filed a motion to compel Defendants to admit that: (1) their diagram failed to depict the two branches of the postal sidewalk that run perpendicular to and connect with the Fenn Street sidewalk; and (2) the postal sidewalk "is not merely an interior sidewalk" but serves "as a thoroughfare for foot traffic between Willis Street and Fenn Street." (Dkt. No. 39, Proposed Admission ¶¶ 2–3.)

On May 2, 2007, Defendants produced a second diagram of the exterior of the Pittsfield Post Office, correcting the errors Plaintiff had identified. (*See* Dkt. No. 40, Ex. 1, Horn Decl., Ex. A.)[12] However, Defendants continued to take the position that "the Postal Service sidewalk provides customer access to the Post Office building

---

10. Defendants observe in their memo that neither the Postmaster nor the Post Office are proper defendants and this action should be brought against the United States Postal Service. However, Defendants have not moved to dismiss or for summary judgment on this basis. The court's allowance of summary judgment in favor of the named Defendants is intended to apply to the Postal Service, to the extent that it is the proper party.

11. Plaintiff also filed a motion to certify a question to the Massachusetts Supreme Judicial Court (Dkt. No. 21), which was denied on September 27, 2007.

12. As previously noted, the court has designated this corrected diagram as Attachment A and appended it to this decision. No dispute now exists as to its general accuracy.

and is not used as a thoroughfare." (Dkt. No. 40, Ex. 1, Horn Decl. ¶ 2.)

On May 15, 2007, Plaintiff filed two briefs, each styled as "Mr. Del Gallo's Brief in Reply to Defendant's Motion for Summary Judgment," and on May 31, 2007, he filed a reply to Defendants' opposition to his motion for summary judgment.

The following day, the court heard argument on the pending motions and instructed the parties to file supplemental affidavits addressing Plaintiff's selective enforcement allegations. In one such affidavit, Defendants attached four photographs of the exterior of the Pittsfield Post Office. (*See* Dkt. No. 49, Exs. 1–4.) These have been appended to this memorandum as Attachments B–E.

## III. *DISCUSSION*

Summary judgment is proper when the record reveals "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party; 'material' means that the fact is one 'that might affect the outcome of the suit under the governing law.'" *Burke v. Town Of Walpole*, 405 F.3d 66, 75 (1st Cir.2005) (internal quotation marks and citations omitted).

■ In ruling on a motion for summary judgment, a district court must construe all facts, as well as reasonable inferences therefrom, in the light most favorable to the non-moving party. *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 8 (1st Cir.2006) (*quoting Medeiros v. Vincent*, 431 F.3d 25, 29 (1st Cir.2005)). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted). Since the issues raised by the cross-motions for summary judgment arise against the same legal backdrop, the discussion below will apply to both motions.

## A. *The Applicability of § 232.1(h)(1).*

■ The lion's share of the briefing in this case has been devoted to the constitutionality of § 232.1(h)(1), which, as noted, bars political campaigning of any kind on postal property. However, it is a cardinal principle of judicial restraint that, "'prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.'" *Buchanan v. Maine*, 469 F.3d 158, 172 (1st Cir.2006) (*quoting Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)). Application of this principle requires the court to address preliminarily two non-constitutional questions: Does mere solicitation of signatures constitute political campaigning? If so, are the postal sidewalks in question indistinguishable from public walkways so as to trigger the exemption set forth at § 232.1(h)?

Plaintiff contends that the solicitation of signatures by a potential candidate for public office is fundamentally different from "campaigning," and therefore he is entitled to an order directing Defendants to permit him to solicit signatures on the postal sidewalk at issue. Plaintiff acknowledges that prevailing on this theory would not entitle him to *collect* signatures on postal property. Solicitation, he concedes, would merely involve requesting willing parties to walk onto *non*-postal property to provide their signatures. This argument, even so limited, is unpersuasive for three reasons.

■ First, it is well-settled that "[w]hen Congress has entrusted an agency with rulemaking and administrative authority, courts ordinarily afford considerable deference to the agency's interpretation of the regulations that it has promulgated under that authority." *Royal Siam Corp. v. Chertoff,* 484 F.3d 139, 145 (1st Cir.2007) (citations omitted). To withhold such deference here, this court would have to conclude that the Postal Service's construction of the "campaigning" ban set forth in § 232.1(h)(1) is " 'plainly erroneous or inconsistent with the regulation.' " *Id.* at 146 (*quoting Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)).

As noted above, when the Postal Service proposed the electioneering prohibition in 1977, it characterized the restriction as "consistent with existing regulations prohibiting the display on bulletin boards" of anything "designed to influence [an] election." Conduct on Postal Property, 42 Fed.Reg. 63,911, 63,911 (Dec. 21, 1977). Since the solicitation of signatures clearly influences elections by determining which candidates will appear on the ballot, the Postal Service's current interpretation of § 232.1(h)(1) is consistent with the regulation's animating purpose.

Second, the Postal Service's ban on political solicitation has been consistent and longstanding. Its futile effort to completely prohibit signature solicitation in 1998 was motivated, in part, by difficulties postmasters had faced in "determining whether or not a given signature solicitation involved campaigning for election to public office." (Hintenach Decl. ¶ 10.) Obviously, if the Postal Service did not have a

policy of construing the solicitation of signatures by candidates as "campaigning," there would have been nothing that compelled postmasters to make the difficult distinction between political and general solicitation.

Plaintiff attempts to counter this argument by citing *IRI I* for the proposition that, prior to 1998, postal regulations "were silent on the subject of soliciting signatures on postal property." 116 F.Supp.2d 65, 68 (D.D.C.2000).[13] While this may be so, "a 1992 postal bulletin expressly permitted 'issue-oriented petitioning [and] campaigning for a referendum or ballot initiative.' " *IRI III,* 417 F.3d 1299, 1303 (D.C.Cir.2005) (citation omitted). The absence of a similar directive permitting candidate-oriented petitioning is additional evidence of a longstanding policy proscribing this activity.

Finally, it bears noting that in nearly identical circumstances the District of Connecticut and the Second Circuit, construing § 232.1(h)(1) in the context of a candidate soliciting signatures, both took it for granted that such conduct constituted "campaigning." *See Longo v. U.S. Postal Serv.,* 761 F.Supp. 220, 223 (D.Conn.1991) (*"Longo I "*) ("Political campaigning, i.e., the solicitation of signatures in a political campaign, is no more intrusive than other forms of signature solicitation . . . .") (emphasis omitted), *rev'd,* 953 F.2d 790, 792 (2d Cir.1992) (*"Longo II "*), *vacated,* 506 U.S. 802, 113 S.Ct. 31, 121 L.Ed.2d 5 (1992) (*"Longo III "*), *reinstated,* 983 F.2d 9, 10–11 (2d Cir.1992) (*"Longo IV "*), *cert. denied,* 509 U.S. 904, 113 S.Ct. 2994, 125 L.Ed.2d 689 (1993).[14]

---

**13.** The *IRI* courts had no occasion to consider the "campaigning" tine of § 232.1(h)(1), as none of the plaintiffs in that case were office seekers.

**14.** Indeed, even the plaintiff in *Longo* conceded that his efforts to obtain signatures fell squarely within § 232.1(h)(1)'s broad electioneering ban. *See* Petition for Writ of Certiorari for Plaintiff–Appellant, *Longo v. U.S. Postal Serv.,* 506 U.S. 802 (1992) (No. 91–

■ In sum, while the current regulation does permit issue-oriented signature solicitation on postal property, signature solicitation to support candidates seeking to get on the ballot is reasonably construed by Defendants as forbidden "campaigning for election to any public office" and therefore barred by § 232.1(h)(1).

Having decided that the Postal Service's construction of "campaigning" is neither plainly erroneous nor inconsistent with the applicable regulation, the court must now turn to the question of whether the postal sidewalk at issue is "physically distinguishable from adjacent municipal ... sidewalks." 39 C.F.R. § 232.1(a)(ii). As previously noted, when the Postal Service amended § 232.1(a) in 2005, it did so in order to protect unwitting "members of the public" who "might not realize that they have entered onto postal property." If the postal sidewalk in question here were not "physically distinguishable" from the public sidewalk, as that term is defined by postal regulations, then § 232.1(h)(1) would not apply and Plaintiff could solicit signatures freely, even though this solicitation constituted a form of political campaigning.

■ In this case, a simple review of Attachment A, and the photographs appended as Attachments B–E, reveals that the entire postal sidewalk is indisputably a "feeder sidewalk,"[15] distinguishable from any public walkway, since each of its segments connects to a municipal sidewalk that runs perpendicular to it. No reasonable jury could find otherwise. The fact that the postal sidewalks inevitably touch municipal walkways cannot signify any blurring of the distinct postal/public

boundary; postal sidewalks must virtually always connect, at some point or points, with public walkways if the public is to find its way to the post office entrance.

Moreover, the stairs between Willis Street and the postal sidewalk are a "physical feature" that signify the customer's entrance onto, or departure from, postal property. The happenstance that pedestrians may occasionally use the clearly distinguishable postal sidewalk as a shortcut (if indeed this occurs) cannot as a matter of common sense render it indistinguishable from the public sidewalks, which except at two points lie at a significant distance from the postal walks, set off by a boundary of grass on the west and the post office parking lot on the north.

In sum, Plaintiff's solicitation of signatures *was* political campaigning, falling within the applicable regulation, and the postal sidewalk on which he solicited was *not* subject to the exemption set forth in § 232.1(a)(ii). Having addressed these two preliminary questions, the court must now consider whether § 232.1(h)(1) violates the First Amendment on its face and, if not, whether the undisputed facts of record would require a jury to conclude that Defendants applied it to him in a discriminatory manner.

B. *The Facial Validity of the Regulation.*

The First Amendment commands that Congress "shall make no law abridging the freedom of speech." U.S. Const. amend. I. Soliciting signatures to place one's name on a ballot is indisputably a form of speech protected by the First Amendment. *See Burson v. Freeman,* 504 U.S. 191, 196, 112

1988), 1992 WL 12074427, at *4–5 ("In order to collect the signatures he needed to appear on the ballot, he campaigned, as he had done in the past, outside United States post offices.").

15. *See* Conduct on Postal Property, 70 Fed. Reg. 72,078, 72,078 (Dec. 1, 2005) (defining "feeder sidewalks" as "sidewalks perpendicular to the perimeter sidewalks").

S.Ct. 1846, 119 L.Ed.2d 5 (1992) (observing that "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.") (internal quotation marks and citations omitted); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("[W]ithout solicitation the flow of ... information and advocacy would likely cease.") (citations omitted).

■ However, the fact that speech is protected "merely begins [the] inquiry." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 799, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). It is clear that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981); *see also Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (citations omitted).

■ To balance the government's interest in restricting the use of its property against the interests of those wishing access to it for expressive conduct, the Supreme Court has established "a framework for determining whether a particular regulation impermissibly infringes upon free speech rights." *Knights of Columbus, Council No. 94 v. Town of Lexington,* 272 F.3d 25, 31 (1st Cir.2001). Under this framework, the extent to which the government can control speech largely depends on "the nature of the relevant forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "A forum can be a traditional public forum, a designated public forum ... or a non-public forum." *New Eng. Reg'l Council of Carpenters v. Kinton,* 284 F.3d 9, 20 (1st Cir.2002).[16]

A traditional public forum is property "which by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Sidewalks, in general, along with streets and parks, can constitute public fora because these areas "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *see also Kinton,* 284 F.3d at 20 ("Some spaces—such as public streets, sidewalks, and parks—are presumptively public fora, and in most cases no particularized inquiry into their precise nature is necessary.") (citation omitted).

Not every sidewalk, however, is a traditional public forum. In *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), for example, the Supreme Court held that sidewalks within a military compound were non-public fora since they were separate and distinct from the streets and sidewalks of the surrounding municipality. *See id.* at 835–37, 96 S.Ct. 1211 (distinguishing the public street at issue in *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (per curiam)). *See also, United States v. Grace,* 461 U.S. 171, 177–80, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (discussing *Greer*).

In assessing whether particular government property constitutes a public forum,

---

**16.** Although some courts refer to the "limited public forum" as a sub-category of the designated public forum, the First Circuit equates limited public fora with non-public fora. *See Ridley v. Mass. Bay Transp. Auth.,* 390 F.3d 65, 76 n. 4 (1st Cir.2004) (citations omitted).

courts focus on a multitude of factors. *See Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1099 (9th Cir.2003) (noting the absence of a "clear-cut test . . . for determining when a traditional public forum exists"); *see also Warren v. Fairfax County*, 196 F.3d 186, 191 (4th Cir.1999) (en banc) (emphasizing that no single factor is "dispositive") (citation omitted).

Factors recognized as significant include: (1) "the nature of the property and its past uses," *Kinton*, 284 F.3d at 22 (citation omitted); (2) "whether expressive activity would tend to interfere in a significant way with the uses to which the government has as a factual matter dedicated the property," *Int'l Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) ("*ISKCON*") (Kennedy, J., concurring); (3) whether the property provides a reasonable person with any indication that she has "entered some special type of enclave," *United States v. Grace*, 461 U.S. 171, 180, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983);[17] (4) whether the property serves as a "public passageway" or "thoroughfare," *United States v. Kokinda*, 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion);[18] and (5) the extent to which the property's "primary use" depends upon "public access," *Kinton*, 284 F.3d at 22.

The government's purpose in constructing the forum carries significant weight. *See, e.g., Kokinda*, 497 U.S. at 727, 110 S.Ct. 3115 (plurality opinion) (emphasizing that the postal sidewalk at issue "was constructed solely to provide for the passage of individuals engaged in postal business").

█ Of the factors identified as relevant by the courts, only one arguably supports a finding of a traditional public forum on the facts of this case. Viewing the record in the light most favorable to Plaintiff, the postal sidewalks were, prior to 2004, used for political campaigning in a manner suggesting that the sidewalk was a traditional public forum. As will be seen below, the undisputed facts of record confirm that this activity was permitted sporadically prior to 2004 out of official laxity born of ignorance of the evolving regulation. Having now been made aware of the regulation, the responsible officials have applied it consistently and without discrimination as to person or viewpoint.

All other factors point away from any designation of Pittsfield's post office sidewalk as a public forum. The layout of the area clearly communicates to reasonable people that they are moving into a "special type of enclave." Although some persons may succumb to the temptation to use the postal property as a shortcut, the distinct postal sidewalk, for the most part well inside and sharply demarcated from the public walkway, could not be described as a "public passageway" or "thoroughfare." Finally, Defendants have a reasonable basis to conclude that the expressive activity proposed by Plaintiff would tend to interfere with the uses to which the government has dedicated the property. Based on all this, no reasonable jury could conclude that the sidewalk area where Plain-

---

**17.** *See also Kinton*, 284 F.3d at 22 (noting the absence of "design characteristics that might be viewed as welcoming the general public").

**18.** *Compare Chi. Acorn v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 702 (7th Cir.1998) ("The sidewalks [on the pier] are not through routes; they only lead to the pier facilities themselves.") *with Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65, 70 (D.Mass.1990) ("Many pedestrians wholly uninterested in the Marketplace's offerings cross its lanes daily in traveling to the waterfront.").

tiff wished to collect signatures was a traditional public forum.

The evidence supporting a finding of a designated public forum is even more scanty.

A designated public forum is property that the government has intentionally opened for expressive conduct by part or all of the public. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (*quoting ISKCON*, 505 U.S. 672, 678, 112 S.Ct. 2701 (1992)); *see also Yeo v. Town of Lexington*, 131 F.3d 241, 255 (1st Cir.1997) (Torruella, C.J., concurring) (explaining that "the state may, from time to time, create a new public forum for the views of the community").

■ To determine whether the government intended to designate a place not traditionally open for speech activities as a public forum, courts must consider the government's explicit expressions regarding intent, as well as its policy and practice. *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir.2004) (*quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). "[I]f there is a conflict, it is to be judged by what [the government] does, not by what it says." *Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 n. 3 (1st Cir.1991) (citation omitted); *see also id.* at 47 (analyzing defendant's action first, "as actual practice speaks louder than words").

■ Regulation of a designated public forum is "subject to the same limitations as that governing a traditional public forum." *ISKCON*, 505 U.S. 672, 678, 112 S.Ct. 2701 (1992) (citation omitted). "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available,

its action is subject to strict scrutiny." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (citations omitted).

■ Ultimately, the government is entitled to alter the nature of any non-public forum as it sees fit. *See Ridley*, 390 F.3d at 77 (citation omitted). Hence, even if the government previously intended to create and maintain a designated public forum, "it would be free to decide *in good faith* to close the forum at any time." *Id.* (emphasis in original).

On the undisputed facts of record in this case, a jury would be required to conclude *either* that the sidewalk in question was never expressly designated as a public forum, or that, if ever so designated, the forum was closed by 2004. In other words, the sidewalk was not a designated public forum, or if so designated at some time, the designation was reasonably withdrawn as of 2004.

The most comfortable doctrinal pigeonhole for the postal sidewalk at issue here is as a non-public forum. "A non-public forum is any public property not open by tradition or explicit designation to the public for expressive activities." *Van Arnam v. Gen. Servs. Admin.*, 332 F.Supp.2d 376, 390 (D.Mass.2004) (*citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). With respect to the property's uses, Plaintiff concedes that the campaigning prohibition found in § 232.1(h)(1) has been consistently enforced at the Pittsfield Post Office since 2004. Thus, this case is substantially in accord with *Kinton*, where the property in question was being used "only for purposes related to the commercial fishing industry." 284 F.3d at 22.

Moreover, as noted, the property at issue constitutes a readily apparent "enclave," where "a clear line of demarcation

in the sidewalk ... distinguishes the federal entryway from the municipal sidewalk." *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir.1992) ("The contested space under the overhang is divided by pillars and metal grill partitions that extend to the end of the federal property."); *see also Utah Gospel Mission v. Salt Lake City Corp.*, 316 F.Supp.2d 1201, 1207–08 (D.Utah 2004) ("[T]he walking surface changes from the ordinary concrete of the City sidewalk to distinct reddish-grey granite pavers."), *aff'd* 425 F.3d 1249 (10th Cir.2005).

Consistent with *United States v. Kokinda*, the Pittsfield postal sidewalk does not serve as a "thoroughfare." Indeed, as noted above, the Supreme Court's *Kokinda* decision is virtually dispositive of the outcome here. In that case, the Court upheld the convictions of two political activists who attempted to solicit monetary contributions from a sidewalk on postal property that a four-Justice plurality later described as follows:

> [T]he Bowie post office is a freestanding building, with its own sidewalk and parking lot. It is located on a major highway, Route 197. A sidewalk runs along the edge of the highway, separating the post office property from the street. To enter the post office, cars enter a driveway that traverses the public sidewalk and enter a parking lot that surrounds the post office building. Another sidewalk runs adjacent to the building itself, separating the parking lot from the building. Postal patrons must use the sidewalk to enter the post office. The sidewalk belongs to the post office and is used for no other purpose.

497 U.S. 720, 723, 110 S.Ct. 3115 (1990) (plurality opinion) (citation omitted).[19]

As Defendants point out, the four-Justice plurality's conclusion that the Bowie postal sidewalk lacked "the characteristics of public sidewalks traditionally open to expressive activity," 497 U.S. at 727, 110 S.Ct. 3115 (plurality opinion), is "consistent with every court of appeals to have decided the public forum status of postal property, with the exception of the Fourth Circuit in *Kokinda*," (Dkt. No. 36, Defs.' Consolidated Mem. 9–11) (citing *Monterey County Democratic Central Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1197–98 (9th Cir.1987); *United States v. Bjerke*, 796 F.2d 643, 648–50 (3rd Cir.1986); *United States v. Belsky*, 799 F.2d 1485, 1487, 1489 (11th Cir.1986); *Paff v. Kaltenbach*, 204 F.3d 425, 433 (3rd Cir.2000); *Longo IV*, 983 F.2d 9, 11–12 (2d Cir.1992)).[20]

---

19. The Fourth Circuit provided the following description of the property:
> The sidewalk on which [respondents] set up their table is approximately seven feet wide and is located on postal service property. The sidewalk runs in front of the Bowie post office and postal patrons must use this walkway to enter the building. A post office parking lot is contiguous to the sidewalk and both the parking lot and the post office building itself are set back from a public road. A municipal sidewalk abuts the public road, runs in front of the parking lot, and is parallel to the post office sidewalk.

*United States v. Kokinda*, 866 F.2d 699, 700 (4th Cir.1989), *rev'd* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). The plaintiffs in *Kokinda* adopted this description in presenting their case to the Supreme Court. *See* Brief for Respondents, *Kokinda*, 497 U.S. 720 (1990) (No. 88–2031), 1989 WL 1127156, at *2.

20. While the four-Justice plurality found that the Bowie postal sidewalk lacked "the characteristics of public sidewalks traditionally open to expressive activity," 497 U.S. at 727, 110 S.Ct. 3115 (plurality opinion), it bears noting that four other Justices perceived no grounds upon which to distinguish it from other traditionally public fora, *see id.* at 744, 110 S.Ct. 3115 (Brennan, J., dissenting), and Justice Kennedy observed that "the wide range of activities" permitted "on this postal sidewalk" gave rise to a "powerful argument" that "it is

It cannot be denied that the sidewalks at issue in the circuit court decisions cited by Defendants possess virtually the same characteristics as the sidewalk here. In *Monterey County*, for example, the walkway in question was "separated from the municipal sidewalks by the Post Office parking area." 812 F.2d at 1197. According to the Ninth Circuit, "[t]he isolated nature of the building and the surrounding walkway indicate to all who approach that the walkway services postal patrons entering the building and that it is not a thoroughfare for passersby intent on other errands." *Id.*

Similarly, in *Longo IV*, the court characterized the layout of the post office where the plaintiff was arrested as "virtually identical" to the layout of the post office in *Kokinda*:

> Both structures are freestanding buildings, separated from the public streets and sidewalks by interior postal walkways. While the main sidewalks are public passageways, the interior walkway is not.

983 F.2d at 11.[21]

■ As this summary demonstrates, the cases addressing postal sidewalks, with the exception of the Fourth Circuit's decision in *Kokinda*, which was reversed, have concluded that these areas constitute, at most, non-public fora. In all these cases,

as in this case, the decision with regard to the nature of the forum is pivotal. If this court were to conclude, in contrast to all the authorities cited above, that the Pittsfield postal sidewalk was a public forum—that is, an area "open to the public for expressive activity such as public streets and park"—then the court would be obliged to apply strict scrutiny to the regulation here. *Kokinda*, 497 U.S. at 726, 110 S.Ct. 3115 (plurality opinion). Regulation of speech in a non-public forum, on the other hand, faces only the test of reasonableness. *Id.* at 727, 110 S.Ct. 3115.

■ Even when the government allows some speech in a non-public forum, such as the issue-oriented leafletting permitted at the Pittsfield Post Office "it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport v. Wash. Educ. Ass'n*, —— U.S. ——, 127 S.Ct. 2372, 2381, 168 L.Ed.2d 71 (2007) (*citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).[22]

■ To determine the reasonableness of a particular regulation, a court must conduct a "fact-intensive balancing test that takes into account such factors as the

---

more than a non-public forum." *Id.* at 737, 110 S.Ct. 3115 (Kennedy, J., concurring).

21. *See also Bjerke*, 796 F.2d at 648 ("At the McKnight and Monroeville post offices, ... the entrance areas are set well back from public thoroughfares."); *Belsky*, 799 F.2d at 1489 ("The post offices in question were all set back from the public road and were designed so that patrons could drive from the city street, park in the postal parking lot, and walk from the parking lot to the building on a connecting walkway."); *Paff*, 204 F.3d at 433 ("The East Brunswick postal building is set back approximately 75 feet from the nearest thoroughfare, Cranbury Road, which has no

adjoining sidewalk. Postal customers enter the building via an access road that connects with Cranbury Road and depart the facility through another access road. As such, the sidewalk area where plaintiffs stood is designed specifically to facilitate access by postal customers to the post office from the parking area.").

22. The hallmark of a viewpoint based distinction is that it "denies access to a speaker solely to suppress the point of view he espouses." *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439.

uses to which the forum typically is put, the particular risks associated with the speech activity at issue, and the proffered rationale for the restriction." *New Eng. Reg'l Council of Carpenters v. Kinton,* 284 F.3d 9, 20 (1st Cir.2002) (citations omitted). While "[t]he reasonableness standard is not a particularly high hurdle," *Ridley v. Mass. Bay Transp. Auth.,* 390 F.3d 65, 90 (1st Cir.2004) (noting that "an action need not be the most reasonable decision possible in order to be reasonable"), the government's "justifications must be solidly grounded," *Kinton,* 284 F.3d at 23. Ultimately, a speech restriction is reasonable "when it is consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated." *ISKCON,* 505 U.S. 672, 688, 112 S.Ct. 2701 (1992) (O'Connor, J., concurring) (internal quotation marks and citations omitted; first and third alterations in original).

▆▆▆▆ The reasonableness of the restriction imposed upon expression within the non-public sidewalk leading to the entrance of the Pittsfield Post Office is beyond debate. The concern that the perception of the Postal Service might be tainted by partisan political patronage is legitimate. Moreover, the concern about the potential disruption and delay involved when a customer, in the middle of a postal errand, encounters a political candidate soliciting signatures has the same ring of "common sense" noted by Justice O'Connor in her plurality opinion in *Kokinda. See* 497 U.S. at 734–35, 110 S.Ct. 3115. Finally, an alternate public forum, permitting not only the solicitation but the collecting of signatures for political candidates, stands no more than a few steps away from the postal sidewalk, in the form of the public walkway stretching halfway around the post office.

In conclusion, the restrictions on political campaigning within this non-public forum are not unreasonable. The regulation in question therefore does not transgress the First Amendment. This holding leaves only the question of the discriminatory enforcement of this valid regulatory provision.

## C. *Discriminatory Enforcement.*

According to Plaintiff, even if § 232.1(h)(1) constitutes a valid speech restriction, the Postal Service has applied it unconstitutionally by enforcing it against him after not enforcing it against scores of other candidates.

"The essence of a viewpoint discrimination claim is that the government has 'intentionally tilt[ed] the playing field for speech.'" *Ridley v. Mass. Bay Transp. Auth.,* 390 F.3d 65, 88 (1st Cir.2004). As the Supreme Court has noted, the government may not "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 392, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

In addition to demonstrating "a pattern of unlawful favoritism," *Thomas v. Chi. Park Dist.,* 534 U.S. 316, 325, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), a plaintiff alleging viewpoint discrimination in this circuit must show invidious intent on the part of the relevant government officials. *See McGuire v. Reilly,* 386 F.3d 45, 63 (1st Cir.2004).[23] Ultimately, such a challenge

---

23. Although courts assessing equal protection claims "have been loathe to infer intent from mere effect," *McGuire,* 386 F.3d at 63 (citations omitted), the First Circuit has acknowledged that "the standard for allowing such an inference of intent from a pattern of impact [might] be more plaintiff-friendly in the First Amendment context, given the special place that First Amendment rights have traditional-

depends "on the factual evidence provided as to how the statutory scheme has in fact operated vis-á-vis the plaintiff[ ]." *Id.*

*McGuire* controls the outcome here. That case involved the enforcement of a Massachusetts statute establishing a six-foot buffer zone protecting persons within an eighteen-foot radius of a health care facility providing abortion services. Anti-abortion activists wishing to offer leaflets to patrons of the health facility objected that the statute constituted viewpoint-based discrimination, because it was aimed at inhibiting the expressive activities of anti-abortion advocates. Even in the face of some evidence that pro-abortion activists violated the statute without sanction, the court upheld the law due to the lack of any evidence suggesting that police were "turning a blind eye" to pro-abortion advocates while strictly enforcing the statute against persons taking the opposite view. *Id.* at 65.

▌▌▌ Beyond Plaintiff's rank speculation, no evidence suggests that, in enforcing the regulation, Defendants facilitated "the speech activities of favored speakers ... or unduly beleaguer[ed] only disfavored speakers." *Id.* at 64 (citation omitted). Admittedly, the Ricci affidavit constitutes evidence that the campaigning prohibition set forth in § 232.1(h)(1) was enforced only sporadically at the Pittsfield Post Office in the eighteen years preceding Plaintiff's arrest. But inconsistent enforcement of a facially neutral regulation is not sufficient to justify a finding of a First Amendment violation. *Desyllas v. Bernstine,* 351 F.3d 934, 944 (9th Cir.2003) (finding university's sporadic enforcement of facially neutral policy insufficient, by itself, to sustain as-applied challenge). To prove viewpoint discrimination, Plaintiff must show that the inconsistent enforcement re-

sulted from disapproval of the content of his speech. As the Supreme Court has noted, "[g]overnment regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (internal quotation marks and citations omitted).

While Plaintiff contends that his views on fathers' rights and gay marriage were responsible for the sudden application of § 232.1(h)(1), Ricci's sworn testimony, to the effect that he was unaware that the ban on political solicitation extended to the postal service sidewalk until other postal employees effectuated Plaintiff's arrest, is undisputed. The record contains no evidence of any discriminatory animus behind the regulation's inconsistent enforcement or of more favorable treatment for Plaintiff's ideological adversaries. As noted, the only evidence suggesting the contrary is Plaintiff's speculation.

It is true, as the First Circuit has explained, that "[e]ven a regulation that does not choose sides or otherwise convey disapproval of a particular message" can violate the First Amendment, since constitutional scrutiny extends to " 'prohibition of public discussion of an entire topic.' " *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 737 (1st Cir.1995) (quoting *Consol. Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980)); *see also Hill v. Colorado,* 530 U.S. 703, 723, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ("Regulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulations.") (citation omitted).

ly held in our constitutional jurisprudence."

*Id.* at 63–64 (citation omitted).

However, where regulations are "intended to serve purposes unrelated to content of the regulated speech" they are "subject to intermediate scrutiny." *Asociacion de Educacion Privada de P.R., Inc. v. Garcia–Padilla,* 490 F.3d 1, 15 (1st Cir.2007) (citation omitted). Under this test, a content-neutral restriction, such as the one imposed by Defendants here, is permissible, provided that it "is narrowly tailored to serve a significant governmental interest" and leaves "open ample alternative channels for communication of the information." *Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8, 12 (1st Cir.2004) (citations omitted). Unlike a content-based speech restriction, a content-neutral regulation "need not be the least restrictive alternative available to the government." *Id.*

Plaintiff's argument regarding the diminished significance of the governmental interest here has some force. One prominent argument offered by the government in favor of the regulation banning political campaigning is the convenience of postal patrons. Yet, solicitation of signatures for non-partisan causes is already permitted. An argument could be made that a request to step off postal property to sign a petition disfavoring gay marriage would offer no more substantial interference to postal traffic than a request to step off postal property to sign a petition to place the name of a candidate disfavoring gay marriage on the ballot.

A more powerful argument regarding the significance of the governmental interest here, also noted by Defendants, is the desire to set proper boundaries around partisan political activity. The Second Circuit addressed this issue eloquently in the *Longo* case:

> If campaigning for public office on postal property were not prohibited, the Postal Service would be beset by requests from eager politicians competing for time and space in the most strategic locations possible, such as the postal walkway involved in this case. Postmasters therefore would be hard pressed to avoid the sort of embroilment in partisan politics that Congress tries to prevent when it reorganized the Postal Service in 1970.... Moreover, on several occasions the Supreme Court has recognized that the avoidance of partisan entanglement or the appearance of political favoritism is a valid justification for restricting First Amendment speech activities.

*Longo II,* 953 F.2d 790, 794–95 (2d Cir. 1992), *vacated on other grounds by* 506 U.S. 802, 113 S.Ct. 31, 121 L.Ed.2d 5 (1992), *reinstated* 983 F.2d 9 (2d Cir.1992) (citations omitted).

The rationale set forth in *Longo* supports the conclusion that a significant government interest has been shown to provide a basis for the regulation in these circumstances.

A final consideration serves to drive this point home. The reasonableness of a regulation is often weighed in light of adequate, alternative avenues for expression. *See IRI III,* 417 F.3d 1299, 1310–11 (D.C.Cir.2005). Here, the city walkway lies literally a few steps away from the postal sidewalk, within easy eye- and ear-shot of the regulated location. *See* Attachment B, appended.

## IV. CONCLUSION

To summarize, the solicitation of signatures to support a political candidate's placement on the ballot for election constitutes "campaigning for election to any public office" and is prohibited by 39 C.F.R. § 232.1(h)(1). The sidewalk in question is distinguishable from the public walkways and therefore does not fall into the exception set forth in 39 C.F.R. § 232.1(a)(ii). The postal sidewalk constitutes a non-public forum, and the regulation banning political campaigning within it is reasonable. Accepting the evidence in the light most favorable to Plaintiff and assuming that the regulation in question was not consistently enforced prior to 2004, no reason-

able jury could conclude from the record before the court that the decision to enforce the regulation arose from bias against the content of Plaintiff's views or expressions. Therefore, even if the postal sidewalk were not a non-public forum, the content-neutral regulation here would be subject only to "intermediate scrutiny." This analysis can lead only to the conclusion, as a matter of law, that Defendants' actions here did not offend the First Amendment, since application of the regulation protected a significant government interest and left open ample alternate avenues for expression.

Based on the foregoing, Plaintiff's Motion for Summary Judgment (Dkt. No. 31) is hereby DENIED. Defendants' Motion for Summary Judgment (Dkt. No. 35) is hereby ALLOWED. Plaintiff's motions for temporary injunction and to permit the filing of a late request for admission (Dkt. Nos. 38 and 39) are hereby DENIED. The clerk is ordered to enter judgment for Defendants on all counts. This case may now be closed.

It is So Ordered.

## ATTACHMENT A

Attachment B

Attachment C

Attachment A

Attachment E

## ATTACHMENT F

 212 Fenn St
Pittsfield, MA 01201