# United States Court of Appeals
## For the First Circuit

No. 08-1511

RINALDO DEL GALLO, III,

Plaintiff, Appellant,

v.

ROGER PARENT, United States Postal Service Postmaster;
PITTSFIELD POST OFFICE,

Defendants, Appellees,

ANTHONY RIELLO, Chief, Pittsfield Police Department,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

David F. Klein with whom Shara L. Boonshaft, Heller Ehrman
LLP, William C. Newman, and American Civil Liberties Union of
Massachusetts were on brief for appellant.
Thomas R. Lotterman, Duke K. McCall, III, Carol E. Head, and
Bingham McCutchen LLP on brief for Humane Society of the United
States, amicus curiae.
Karen L. Goodwin, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief
for appellees.

February 25, 2009

**LYNCH**, **Chief Judge**.  This case concerns whether the Free Speech Clause of the First Amendment compels the U.S. Postal Service to allow campaigning activity for election to public office on a post office sidewalk, constructed and used to give postal patrons access to the door of the post office and distinguishable from neighboring public sidewalks.

Plaintiff Rinaldo Del Gallo, III, a candidate for public office in Massachusetts, brought suit in 2006 seeking to prevent the Pittsfield Post Office from enforcing a Postal Service regulation that restricted his ability to collect signatures for his campaign on its sidewalk.  The district court granted summary judgment for the defendants, Pittsfield Postmaster Roger Parent and the Pittsfield Post Office, finding that the restriction did not violate the First Amendment.  See Del Gallo v. Parent, 545 F. Supp. 2d 162, 183-84 (D. Mass. 2008).  We affirm.

I.

A.        The Modern Postal Service and the Regulation

The Constitution empowers Congress "'To establish Post Offices and post Roads' and 'To make all Laws which shall be necessary and proper' for executing this task."  U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 121 (1981) (quoting U.S. Const. art. I, § 8).  Congress has directed the Postal Service to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees,"

39 U.S.C. § 403(a), and to "maintain an efficient system of collection, sorting, and delivery of the mail nationwide," id. § 403(b)(1). Congress expressly authorized the Postal Service to adopt rules and regulations to accomplish these ends. Id. § 401(2); see also Council of Greenburgh Civic Ass'ns, 453 U.S. at 123.

The Postal Service has regulations concerning conduct on its property, which are set forth at 39 C.F.R. § 232.1. At issue is the application of paragraph (h) of that regulation, which bans "campaigning for election to any public office" on post office property. The regulation was applied to stop plaintiff from campaigning on the Pittsfield Post Office sidewalk. Along with the ban on election campaigning, which is at issue here, the regulation also bans "collecting signatures on petitions," "[s]oliciting alms and contributions," "vending for commercial purposes," and other related conduct on postal property, but these bans are not at issue.

Significantly, the Postal Service's regulation itself draws distinctions based on the character and location of its property. The ban on election campaigning applies to sidewalks on post office property. 39 C.F.R. § 232.1(a). But the ban explicitly does not apply to postal sidewalks "along the street frontage of postal property . . . that are not physically

distinguishable from adjacent municipal or other public sidewalks." Id. § 232.1(a)(ii).[1]

As the Supreme Court noted in another First Amendment challenge to a Postal Service restriction, "only by review of the history of the postal system and its present statutory and regulatory scheme can the constitutional challenge to [the restriction] be placed in its proper context." Council of Greenburgh Civic Ass'ns, 453 U.S. at 121. The regulation at issue relates to one of the Postal Service's longstanding problems and grows out of Congress's and the Service's attempts to address this problem.

Through much of its history, the post office was closely tied to partisan politics. Until 1970, the post office was organized as a Cabinet-level department within the executive branch of the federal government. See H.R. Rep. No. 91-1104 (1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3657. The Postmaster General was appointed by the President, and his "presence in the President's Cabinet creat[ed] a link between partisan politics and

---

[1] The carve-out for postal sidewalks which are indistinguishable from municipal sidewalks was added in 2005 following the D.C. Circuit's opinion in Initiative & Referendum Institute v. U.S. Postal Service, 417 F.3d 1299 (D.C. Cir. 2005). That opinion reviewed the facial validity of the portion of the regulation which, at that time, banned "soliciting signatures on petitions, polls, or surveys." Id. at 1302. The regulation has since been amended so that it now bans only "collecting signatures on petitions, polls, or surveys," 39 C.F.R. § 232.1(h) (emphasis added). See Conduct on Postal Property, 70 Fed. Reg. 72,078, 72,078 (Dec. 1, 2005).

-4-

the [post office]." Id. at 3660.  Congress was deeply involved in the management of the post office, including rate setting, selection of local postmasters, and the details of labor relations. See id. at 3653, 3662, 3667; R. Geddes, Saving the Mail 7-9 (2003). As one aspect of the political entanglement, the post office was also an important source of political patronage jobs.  H.R. Rep. No. 91-1104, reprinted in 1970 U.S.C.C.A.N. at 3661 (stating that "vestiges of 19th century political patronage practices have persisted in the Post Office Department"); Geddes, supra, at 8 ("[P]ostmasters were often chosen to provide political patronage under a[] . . . system [that] allowed members of Congress and occasionally local party officials to choose the local postmaster."); S. Calabresi & C. Yoo, The Unitary Executive During the Second Half-Century, 26 Harv. J.L. & Pub. Pol'y 667, 672 (2003) (describing the nineteenth century Post Office Department as being "heavily patronage-influenced"); S. Kernell & M. McDonald, Congress and America's Political Development: The Transformation of the Post Office from Patronage to Service, 43 Am. J. Pol. Sci. 792, 792, 796-97 (1999) (stating that "[t]hroughout the nineteenth century the political fortunes of members of Congress depended heavily on their ability to send patronage home to their states" and that "[m]ost of these [patronage] jobs were located in the post office"); L. Kramer, Putting the Politics Back into the Political Safeguards of Federalism, 100 Colum. L. Rev. 215, 280 & n.256

(2000) ("State and local parties . . . exerted influence over federal administration through spoils rotation, providing personnel to staff local federal post offices . . . ."); J. Mashaw, Administration and "The Democracy": Administrative Law from Jackson to Lincoln, 1829-61, 117 Yale L.J. 1568, 1621, 1691 (2008) (noting the "massive use of patronage" in the Post Office Department in the nineteenth century).  These historic associations between the post office and electoral politics are no longer considered acceptable.

In 1970, Congress passed the Postal Reorganization Act, Pub. L. No. 91-375, 84 Stat. 719, "to deal with the problems of increasing deficits and shortcomings in the overall management and efficiency of the Post Office," Council of Greenburgh Civic Ass'ns, 453 U.S. at 122.  In doing so, Congress recognized that partisan political entanglement was one of the foremost problems facing the post office.  See H.R. Rep. No. 91-1104, reprinted in 1970 U.S.C.C.A.N. at 3661 ("[O]ne of the cardinal needs of postal reform is to seal off the Postal Service from partisan political influence.").  The close connection between partisan politics and Post Office Department contributed to inefficiencies and to problems in rate setting and management.  See id. at 3653, 3660-61, 3667; Geddes, supra, at 7-11.

Congress was also concerned with the effect that the connection between electoral politics and the post office had on public perception.  See H.R. Rep. No. 91-1104, reprinted in 1970

U.S.C.C.A.N. at 3653 ("[D]etailed congressional involvement in the technical details of postal economics . . . [led to] a widespread public impression that the influence of special interests has a determining effect on the structure of today's postal rates."). Moreover, Congress determined that "political patronage practices [had] persisted in the Post Office Department too long." H.R. Rep. No. 91-1104, reprinted in 1970 U.S.C.C.A.N. at 3661; see also id., reprinted in 1970 U.S.C.C.A.N. at 3654 ("Nineteenth century customs of political patronage have no place in a late 20th century postal system.").

Thus, Congress sought to have "the Post Office . . . taken out of politics and politics out of the Post Office." H.R. Rep. No. 91-1104, reprinted in 1970 U.S.C.C.A.N. at 3654. The Postal Reorganization Act abolished the Post Office Department as a Cabinet-level Department and established in its place the United States Postal Service as a government-owned corporation. Id. at 3657; see also Council of Greenburgh Civic Ass'ns, 453 U.S. at 122. Significantly, Congress directed the new Postal Service be funded by its own revenue and "run more like a business than had its predecessor, the Post Office Department." Franchise Tax Bd. v. U.S. Postal Serv., 467 U.S. 512, 519-20 (1984). In an increasingly competitive market, "Congress . . . directed the Service to become a self-sustaining service industry and to 'seek out the needs and desires of its present and potential customers -- the American

public.'"  United States v. Kokinda, 497 U.S. 720, 732 (1990) (plurality opinion) (quoting H.R. Rep. No. 91-1104, reprinted in 1970 U.S.C.C.A.N. at 3668).

Congress sought to insulate the Postal Service from electoral politics by "establishing institutional buffers between the President and the Congress on the one hand, and the officers and employees of the Postal Service on the other."  H.R. Rep. No. 91-1104, reprinted in 1970 U.S.C.C.A.N. at 3661.  The Postal Reorganization Act distanced elected officials from rate setting and the day-to-day management of the Postal Service and put additional protections in place to address the problem of patronage.  See id.  It also empowered the Postal Service to adopt rules and regulations in furtherance of these objectives.  See 39 U.S.C. § 401(2); H.R. Rep. No. 91-1104, reprinted in 1970 U.S.C.C.A.N. at 3674.

In 1972, shortly after the enactment of the Postal Reorganization Act, the Postal Service published a set of regulations governing conduct on postal property.  See Conduct on Postal Property, 37 Fed. Reg. 24,346, 24,346-47 (Nov. 16, 1972).  Five years later, in 1977, the Service proposed a number of amendments to these regulations, including a prohibition on campaigning for election to public office.  See Conduct on Postal Property, 42 Fed. Reg. 63,911, 63,911 (Dec. 21, 1977).  The proposed campaign amendment was said to be consistent with existing

regulations prohibiting the display on bulletin boards of photographs and other materials designed to influence elections. Id. This was part of a set of amendments based on the experience of the Postal Service. See id. at 63,911-12. The new regulations were adopted in 1978. Conduct on Postal Property, 43 Fed. Reg. 38,824, 38,824 (Aug. 31, 1978). The stated purpose of the ban on campaigning for election to public office was "to prevent abuses and to preclude any appearance of partisan endorsement or preference." Id.

Thus, the regulation was intended to further address the problems of political entanglement with which Congress was concerned in passing the Postal Reorganization Act. See Longo v. U.S. Postal Serv. (Longo I), 953 F.2d 790, 794 (2d Cir.) (stating that the "primary justification for the prohibition against campaigning on postal property is that it enables the Postal Service to avoid both actual entanglement in partisan politics and the appearance of political favoritism" and that without the prohibition, postmasters "would be hard pressed to avoid the sort of embroilment in partisan politics that Congress tried to prevent when it reorganized the Postal Service in 1970"), vacated on other grounds, 506 U.S. 802 (1992).

-9-

B.		Del Gallo's Election Campaigning Activity at the Pittsfield Post Office

The Pittsfield Post Office[2] sits at the corner of Fenn Street and Willis Street in downtown Pittsfield.  The building is shaped roughly like a sideways "L," with the short portion pointing north toward Fenn Street and the long portion pointing west toward Willis Street.  Between the two portions is a parking lot for postal customers.  The parking lot extends north up to the Fenn Street municipal sidewalk.  Motorists enter and exit the parking lot from Fenn Street through two driveways that intersect the municipal sidewalk.  To the west of the parking lot is a small grass-covered patch that slopes downward to the Willis Street municipal sidewalk.  Pedestrians get to the post office from the municipal sidewalk on Fenn Street by using the post office sidewalk, which follows the shape of a "U" with an elongated base, running south from Fenn Street between the parking lot and the grassy patch, then east along the front of the post office and past the front door, then turning north along the eastern side of the post office back to Fenn Street.  Both times it meets the Fenn Street sidewalk at a right angle.  The post office sidewalk is also accessible from the Willis Street sidewalk through a short flight of concrete stairs that intersect the grassy patch and lead directly to the bottom portion of the "U."

_____

		[2]	While the national entity is the U.S. Postal Service, it runs local post offices.

-10-

Beyond providing access for postal customers, the post office sidewalk and stairs may also be used by pedestrians as a "shortcut" between the Willis Street and Fenn Street sidewalks. This path is no shorter than simply walking along the municipal sidewalks, and it involves walking up or down stairs. It is possible for a pedestrian, however, to avoid the two driveways that intersect the Fenn Street sidewalk by taking the stairs and walking along the front of the post office. One long-serving post office employee, Ronald Ricci, who worked as a customer service supervisor since 1986, stated that he has never seen the post office sidewalk actually used in this manner.

In April 2004, plaintiff was running for a position on the Massachusetts Governor's Council.[3] He attempted to solicit signatures for his election campaign in the lobby of the Pittsfield Post Office. A customer complained. Supervisor Ricci, who did not know of the regulation, instructed plaintiff that he could not solicit signatures inside the post office, but that he could do so outside on the post office sidewalk, so long as he did not block the doorway or bother people. Plaintiff went outside and campaigned. A number of customers complained to Ricci that plaintiff was harassing them, stepping in front of them and

---

[3] The Governor's Council is a body of eight councilors, elected every two years, who provide advice to the governor of Massachusetts. See Mass. Const. pt. 2, ch. 2, § 3, art. I, amended by Mass. Const. amend. arts. XVI, LXXXII.

-11-

pressing them for signatures; one woman said plaintiff was intimidating and scaring her. Ricci went outside, explained to Del Gallo that customers were complaining, and asked Del Gallo to stop harassing customers. Ricci did not ask Del Gallo to leave or to stop campaigning.

The following day, Del Gallo returned and solicited signatures for his campaign inside the post office. Ricci again told him he could not solicit signatures in the lobby. Del Gallo left. Ricci was not aware of Del Gallo doing any soliciting outside; it was raining.

Later that month, Del Gallo again returned to solicit signatures for his campaign. That morning, he encountered Paula Cooke, a post office supervisor, as she approached the front door of the post office. Cooke's work ordinarily did not take her to the front door or lobby of the post office. She was filling in as Officer in Charge that day due to the absence of a coworker. Del Gallo asked Cooke to sign his petition and Cooke, who was aware of the postal regulation, informed plaintiff that it was impermissible for him to campaign on the post office sidewalk. When Del Gallo ignored her, Cooke went inside and asked James Curley, another customer service supervisor, to tell Del Gallo he could not continue his campaigning in that location. As he was leaving to speak with Del Gallo, Curley was informed by the window clerks that customers were complaining that Del Gallo had been harassing them

-12-

outside.  Curley told Del Gallo that he would need to move his campaigning to the nearby public sidewalk; Del Gallo refused to do so.  Later, more customers complained that Del Gallo was harassing them; after reviewing the Postal Operations Manual, Cooke and Curley decided to call the Pittsfield Police Department.  Police officers arrived and asked plaintiff to stop campaigning on the post office sidewalk; plaintiff refused, and he was arrested.  He did not file suit at the time.

Before plaintiff's arrest on or about April 24, 2004,[4] the Pittsfield Post Office sidewalk had been used by people campaigning for public office and gathering signatures for nomination papers and ballot initiatives, although the extent of such usage is unclear from the record.  Del Gallo claimed that before this time, "countless candidates for political office . . . were allowed to gather signatures at the Pittsfield Post Office."  Jonathan Levine, the publisher of the Pittsfield Gazette, stated in his affidavit that "over the years" he had "seen numerous potential candidates for office gathering nomination paper signatures" on trips to the Pittsfield Post Office.  And Jonathan Melle, who had been a candidate for state senator, stated that "on or about the time period of the entire month of February and up to the middle of March 2004," he gathered signatures on the sidewalk of the

_____

[4]    Curley recalls the date of plaintiff's arrest as April 21, 2004, while Cooke states it was April 24, 2004.  The difference is immaterial.

-13-

Pittsfield Post Office. None of the affidavits state that the observed campaign activities before April 2004 took place with the permission of Postal Service officials, that permission of officials was requested, or that such officials were aware of the activity. None of the affidavits state that any such activities took place after April 24, 2004.

Affidavits filed by postal employees provide a framework for the pre-April 2004 observations contained in the affidavits of Del Gallo, Levine, and Melle. The affidavits demonstrate several different things. To the extent postal officials were aware of such election campaigning activities, there was irregular enforcement of the regulation before April 2004 due to a lack of knowledge of the regulation by some employees. The Postal Service officials who were aware of the regulations enforced it. Ricci was unaware at that time that the Postal Service had a regulation barring campaigning and collecting signatures on postal sidewalks. He stated that, "on occasion," he received requests from individuals seeking to conduct campaigning activity on Pittsfield Post Office property. He admittedly, in his ignorance of the regulation, had told some individuals before Del Gallo's arrest in April 2004 that they could conduct such activities on the sidewalk outside the post office. After April 2004, when he was aware of the regulation, he enforced it.

-14-

Curley, who was aware of the regulation, enforced it before April 2004. He described "two occasions" in which he instructed individuals that they were not allowed to campaign on the postal sidewalk and that they would have to move to one of the public sidewalks. Curley also told Del Gallo in April 2004 to stop soliciting signatures on the sidewalk because it was contrary to regulations. Curley said his usual duties did not involve his being in the lobby or interacting with customers. When he went out to tell Del Gallo to stop, it was not because he saw Del Gallo on the sidewalk, but because he was told to do so by Cooke, who was the Officer in Charge that day. Cooke stated that "[o]ther than Mr. Del Gallo," she was "not aware that any political candidates [had] used [the] Postal Service sidewalk to campaign and solicit signatures." Further, she was aware of his sidewalk activities because she was returning to the post office through the front door. Cooke's job mostly kept her in a work room at the rear of the post office, where she could see neither the sidewalk nor the lobby.

It is undisputed that following Del Gallo's arrest in April 2004, the regulation has been consistently enforced. Ricci stated that since April 2004, two individuals asked to solicit signatures to run for public office on the postal sidewalk; he told both they could do so only on the public sidewalk.

In 2006, plaintiff once again ran for Governor's Council, his prior effort having failed. Plaintiff was required to gather a thousand certified signatures for his campaign by May 2, 2006. He conferred on a number of occasions that year with Postmaster Roger Parent, to request permission to gather signatures for his campaign on the post office sidewalk. Del Gallo told Parent that, in his view, under the D.C. Circuit's then-recent decision in Initiative & Referendum Institute v. U.S. Postal Service, 417 F.3d 1299 (D.C. Cir. 2005), it was illegal for the post office to prevent him from campaigning on its sidewalks. Parent conferred with counsel and denied plaintiff's requests.

On March 27, 2006, plaintiff and a companion were gathering signatures for plaintiff's campaign on the Fenn Street municipal sidewalk, near the post office. At some point that day, police officers told plaintiff that he was not allowed to campaign on the post office's property. Plaintiff asked the officers whether he would be allowed to do so if he merely stood on the post office sidewalk and directed those interested in signing his petition to the public sidewalk, where his companion would be standing. After consulting with post office staff, the officers informed plaintiff this was not allowed.

Plaintiff brought suit on April 7, 2006, before a single Justice of the Massachusetts Supreme Judicial Court. The suit sought to enjoin the Pittsfield police and Postmaster Parent from

preventing plaintiff's campaigning on the post office sidewalk; it also sought a declaration that it was unconstitutional to prevent plaintiff from gathering signatures for his campaign on that sidewalk. The case was removed to federal district court on April 18, 2006. On March 19, 2007, plaintiff moved for summary judgment. On April 24, defendants also moved for summary judgment. The parties filed various affidavits.

The district court granted summary judgment in favor of defendants. Del Gallo, 545 F. Supp. 2d at 184. The court found, first, that 39 C.F.R. § 232.1(h) was applicable to the activity at issue in this case because plaintiff was engaged in "campaigning," see id. at 173-75, and because the sidewalk on which he was attempting to do so was distinguishable from the surrounding municipal sidewalks, thus bringing it into the purview of the regulation as amended in 2005, see id. at 175. Second, the court held that the sidewalk outside the Pittsfield Post Office was neither a traditional nor a designated public forum. See id. at 176-80. In light of the nature of the forum, the court found that the Postal Service's ban on campaigning for election was constitutional because it was reasonable and viewpoint neutral. See id. at 180-81. Finally, the court rejected plaintiff's claim of selective enforcement, finding that there was no evidence, beyond plaintiff's speculation, of any pattern of unlawful favoritism. See id. at 181-82.

-17-

Plaintiff timely appealed.

II.

We review de novo the district court's grant of summary judgment, drawing all reasonable inferences in favor of the non-moving party.  New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 19 (1st Cir. 2002).  Summary judgment is appropriate only where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Kinton, 284 F.3d at 19.  "We engage in de novo review of ultimate conclusions of law and mixed questions of law and fact in First Amendment cases."  Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 75 (1st Cir. 2004).

As an initial matter, to the extent plaintiff has raised not only an as-applied challenge but also a facial challenge[5] to the pertinent provision of 39 C.F.R. § 232.1(h), we quickly dispose of this claim.  "In a facial attack case, it is plaintiff's burden to show that the law has no constitutional application."  Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 33 (1st Cir. 2008).  Plaintiff has not come close to meeting this burden.  See McGuire v. Reilly, 386 F.3d 45, 57 (1st Cir. 2004); see also United States

---

[5]    The Humane Society of the United States, whose concern is primarily with another portion of the regulation regarding "collecting signatures on petitions, polls, or surveys," 39 C.F.R. § 232.1(h), not with campaigning for election to public office, filed a brief as amicus curiae in support of plaintiff's facial challenge.

v. Bjerke, 796 F.2d 643, 648 (3d Cir. 1986). Nor has plaintiff attempted to establish that the regulation is overbroad. See Virginia v. Hicks, 539 U.S. 113, 118-20 (2003); see also Initiative & Referendum Inst., 417 F.3d at 1312-13; Longo I, 953 F.2d at 797-98. We thus turn to the as-applied challenge.

Plaintiff's attempts to gather signatures for his election campaigns is undoubtedly a form of speech protected by the First Amendment. See Burson v. Freeman, 504 U.S. 191, 196 (1992) (plurality opinion); Longo I, 953 F.2d at 793. This protection, however, is not absolute. "Even protected speech is not equally permissible in all places and at all times." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799 (1985); see also Kinton, 284 F.3d at 19; Knights of Columbus, Council No. 94 v. Town of Lexington, 272 F.3d 25, 31 (1st Cir. 2001); Longo I, 953 F.2d at 793; Monterey County Democratic Cent. Comm. v. U.S. Postal Serv., 812 F.2d 1194, 1196 (9th Cir. 1987).

It is "well settled that the government need not permit all forms of speech on property that it owns and controls." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992) (citing Council of Greenburgh Civic Ass'ns, 453 U.S. at 129); accord, e.g., Kokinda, 497 U.S. at 725 (plurality opinion); United States v. Belsky, 799 F.2d 1485, 1488 (11th Cir. 1986). The government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is

-19-

lawfully dedicated."   Greer v. Spock, 424 U.S. 828, 836 (1976) (quoting Adderley v. Florida, 385 U.S. 39, 47 (1966)); accord Council of Greenburgh Civic Ass'ns, 453 U.S. at 129-30.

Specifically, the Postal Service here is acting as proprietor.  "Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." Int'l Soc'y for  Krishna Consciousness, 505 U.S. at 678; accord, e.g., Kokinda, 497 U.S. at 725 (plurality opinion) (citing Lehman v. City of Shaker Heights, 418 U.S. 298 (1974); Cafeteria & Rest. Workers v. McElroy, 367 U.S. 886, 896 (1961)); Ridley, 390 F.3d at 79 ("[A] lower level of scrutiny usually applies when the government acts as proprietor."); Jacobsen v. U.S. Postal Serv., 993 F.2d 649, 654 (9th Cir. 1993).

The parties and the district court approached this case as one to be analyzed under the forum analysis doctrine.[6]  The

---

[6]    The utility and coherence of the forum analysis doctrine have been the subject of criticism.  See, e.g., Int'l Soc'y for Krishna Consciousness, 505 U.S. at 693-94 (Kennedy, J., concurring in the judgments) ("Our public forum doctrine ought not to be a jurisprudence of categories rather than ideas . . . ."); Kokinda, 497 U.S. at 741-43 & n.1 (Brennan, J., dissenting) (criticizing the plurality's use of forum analysis as "doctrinal pigeonholing" and collecting sources of criticism); L. Tribe, American Constitutional Law § 12-24, at 987, 992 (2d ed. 1988) (describing the doctrine as "quite manipulable and problematic" and noting that "whether or not a given place is deemed a 'public forum' is ordinarily less significant than the nature of the speech restriction"); R. Post, Between Governance and Management: The History and Theory of the

Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Kokinda, 497 U.S. at 726 (plurality opinion) (quoting Cornelius, 473 U.S. at 800); accord, e.g., Int'l Soc'y for Krishna Consciousness, 505 U.S. at 678; Knights of Columbus, 272 F.3d at 31.   Under this approach, the validity of a restriction is determined by examining: (1) "the nature of the forum in which a restriction applies"; and (2) "the type of restriction." Kinton, 284 F.3d at 19-20.  We will utilize forum analysis since the Supreme Court has continued to utilize the doctrine and has used it twice in First Amendment challenges to Postal Service regulations, see Kokinda, 497 U.S. at 725-37 (plurality opinion); Council of Greenburgh Civic Ass'ns, 453 U.S. at 128-34.

Plaintiff correctly says that since Kokinda was a plurality opinion, its forum analysis does not dictate our analysis of the forum question.  In Kokinda the Supreme Court upheld a separate restriction on "[s]oliciting alms and contributions," 39 C.F.R. § 232.1(h), on a sidewalk in front of a post office, see

Public Forum, 34 UCLA L. Rev. 1713, 1715-16 & n.7 (1987) ("[The public forum doctrine] has received nearly universal condemnation from commentators and is in . . . a state of disrepair . . . ."). We have elsewhere noted that this approach has been criticized as particularly unhelpful where the government is operating in a commercial context.  Ridley, 390 F.3d at 75.

-21-

Kokinda, 497 U.S. at 722-23 (plurality opinion).  The four-Justice plurality found that the postal sidewalk in Kokinda was a non-public forum, id. at 727, 730 (plurality opinion), and the four-Justice dissent came to the opposite conclusion, id. at 752 (Brennan, J., dissenting).  The deciding concurring opinion withheld judgment on the forum issue.[7]  Id. at 738 (Kennedy, J., concurring in the judgment).

As such, this plurality decision is instructive, but not dispositive of the forum analysis.  Other courts agree.  See Initiative & Referendum Inst., 417 F.3d at 1313 (finding that Kokinda "'provides no definitive guidance' on the forum status of postal sidewalks"); Jacobsen, 993 F.2d at 654-55 (finding that Kokinda does not give "a definitive answer on whether [postal sidewalks] are public fora"); Longo v. U.S. Postal Serv. (Longo II), 983 F.2d 9, 11 (2d Cir. 1992) (stating that the court was "not necessarily bound by the Supreme Court's plurality opinion in . . . Kokinda" but choosing to follow that analysis).

A.        The Nature of the Forum

Our first inquiry is whether the sidewalk at issue in this case is a traditional public forum, of the sort that has "'immemorially . . . time out of mind' been held in the public

_____

[7] The opinion did state, however, that there was a "powerful argument" that the postal sidewalk in question was "more than a nonpublic forum."  Id. at 737 (Kennedy, J., concurring in the judgment).

trust and used for purposes of expressive activity." Int'l Soc'y for Krishna Consciousness, 505 U.S. at 680 (omission in original) (quoting Haque v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939)). "[R]egulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny." Id. at 678. We examine both the characteristics of the property and its history and purpose. See id. at 679-80; Kinton, 284 F.3d at 20-21; see also Kokinda, 497 U.S. at 728-29 (plurality opinion) ("[T]he location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum.").

It is quite clear that the First Amendment would not entitle plaintiff to campaign inside the Postal Service building or in its doorway. It is also quite clear that First Amendment expression would be protected on the municipal sidewalks on Fenn Street and Willis Street, just as it is on the large public sidewalks at the base of the many steps leading up to the majestic colonnade of the U.S. Supreme Court, United States v. Grace, 461 U.S. 171, 178-80 (1983). The sidewalk at issue in this case is in between those two different ends of the spectrum.

We have previously said that some spaces, "such as public streets, sidewalks, and parks," are "presumptively public fora," such that "in most cases no particularized inquiry into their precise nature is necessary." Kinton, 284 F.3d at 20. But

<u>Kinton</u>'s observation must be understood in the context of the Supreme Court's recognition that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." <u>Council of Greenburgh Civic Ass'ns</u>, 453 U.S. at 129. Not all sidewalks owned by the large variety of government bodies are alike and not all sidewalks are public fora. That conclusion is mandated by the Court's decision in <u>Greer</u>, 424 U.S. at 835-38. <u>See</u> <u>Kokinda</u>, 497 U.S. at 727 (plurality opinion) (holding that "[t]he presence of sidewalks and streets within the base [in <u>Greer</u>] did not require a finding that it was a public forum"); <u>Kinton</u>, 284 F.3d at 20. A particularized inquiry is required here. In this case, the "nature of the locus . . . [and] its history" do not support a finding that sidewalk outside the Pittsfield Post Office is a traditional public forum. <u>Kinton</u>, 284 F.3d at 20-21.

The Postal Service sidewalk here "does not have the characteristics of public sidewalks traditionally open to expressive activity." <u>Kokinda</u>, 497 U.S. at 727 (plurality opinion). In analyzing the physical nature of this forum, the fact that the nearby municipal sidewalk may well be a public forum is not the critical issue. Rather, the Supreme Court has emphasized that "separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction." <u>Int'l Soc'y for Krishna Consciousness</u>,

-24-

505 U.S. at 680; accord Grace, 461 U.S. at 180, 183 (focusing on whether there was any "separation" or any "indication whatever to persons stepping from the street to the curb and sidewalks . . . that they [had] entered some special enclave"); see also Kinton, 284 F.3d at 22; Monterey County Democratic Cent. Comm., 812 F.2d at 1197; Bjerke, 796 F.2d at 647-48. In this case, the postal sidewalk was physically distinguishable, such that a person stepping onto the Post Office property would be aware he had departed from the municipal sidewalk.

The record also establishes that the Postal Service sidewalk on which plaintiff attempted to campaign is clearly separate from the nearby municipal sidewalks. The Postal Service sidewalk meets the municipal sidewalk on Fenn Street twice at right angles, but the sidewalks are otherwise separated by the Post Office parking lot. The Postal Service sidewalk is separated from the municipal sidewalk on Willis Street by an inclined grass-covered area; the two sidewalks are connected only by a short flight of concrete stairs. The fact that postal sidewalks almost inevitably touch municipal sidewalks cannot be the basis for a finding that the two are indistinguishable, as the district court properly noted, see Del Gallo, 545 F. Supp. 2d at 175. Here, the divide between Post Office property and the municipal sidewalks was obvious. See Grace, 461 U.S. at 179-80; Greer, 424 U.S. at 830; Paff v. Kaltenbach, 204 F.3d 425, 431 (3d Cir. 2000); Jacobsen, 993

-25-

F.2d at 656; Longo II, 983 F.2d at 11-12; Monterey County Democratic Cent. Comm., 812 F.2d at 1197; Belsky, 799 F.2d at 1489; Bjerke, 796 F.2d at 649.

The past uses and purpose of this Postal Service sidewalk also support the conclusion that it is not a traditional public forum. Traditional public forums are "places which by long tradition or by government fiat have been devoted to assembly and debate." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). In contrast, the Pittsfield Post Office sidewalk has not consistently, historically "been used for public assembly and debate," nor was it intended to be used as such. See Frisby v. Schultz, 487 U.S. 474, 480 (1988).

As for purpose, the Postal Service sidewalk in question is there to provide customers access to the entry to the Pittsfield Post Office. It is neither a public thoroughfare nor a gathering place. See Kokinda, 497 U.S. at 727-28 (plurality opinion) ("[T]he postal sidewalk was constructed solely to provide for the passage of individuals engaged in postal business . . . [and] not to facilitate the daily commerce and life of the neighborhood or city."); Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 651 (1981) (describing a public street as "a necessary conduit in the daily affairs of the locality's citizens . . . [and] a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment");

-26-

Lederman v. United States, 291 F.3d 36, 44 (D.C. Cir. 2002) (contrasting the postal sidewalk in Kokinda from the sidewalk surrounding the Capitol's East Front, which "facilitat[es] tourist access to . . . a centerpiece of our democracy" and serves as "a place from which tourists may view and photograph the Capitol"); Belsky, 799 F.2d at 1489 ("These walkways are intended to accommodate traffic to and from the post office for the conduct of postal business and have not traditionally been sites for expressive conduct."); Bjerke, 796 F.2d at 649 ("The walkways in question were not dedicated to serve the traditional functions of streets or parks but rather for the particular function of accommodating post office patrons on official business . . . .").

As to past usage, this Postal Service sidewalk, unlike ordinary municipal sidewalks, has functioned historically not as a place to "promot[e] 'the free exchange of ideas'" but to allow customers to have easy access to the Pittsfield Post Office's products and services, as is necessary for a business that "must provide services attractive to the marketplace." Int'l Soc'y for Krishna Consciousness, 505 U.S. at 682 (quoting Cornelius, 473 U.S. at 800); accord Kokinda, 497 U.S. at 728 (plurality opinion); Belsky, 799 F.2d at 1489; Bjerke, 796 F.2d at 649 ("[T]he function of Postal Service property is to facilitate the provision of efficient postal services, and not to provide a public platform for political advocacy." (citing 39 U.S.C. § 101(a))).

-27-

Notwithstanding this, plaintiff argues this Postal Service sidewalk must be considered a traditional public forum because it had been used for political election campaigning before April 2004, when plaintiff was first arrested for refusing to leave the Postal Service sidewalk, and because pedestrians may at times use the postal sidewalk as a shortcut between the two municipal sidewalks. There is no claim it was used for election campaigning after April 24, 2004. Plaintiff's evidence, even taking all inferences in his favor, is not sufficient to change the "dominant character" of this forum. See Kinton, 284 F.3d at 22 (holding that even if the public had regular access to Fish Pier, and even if Massport's policy was "erratically enforced," this was not enough to "convert the Fish Pier into a traditional public forum"); see also Ridley, 390 F.3d at 78.

The Pittsfield Post Office sidewalk is also not made into a designated public forum by this past usage because there was no affirmative intent to create such a forum. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Ridley, 390 F.3d at 76 (quoting Cornelius, 473 U.S. at 802) (internal quotation marks omitted). The record reveals no evidence of such affirmative intent by the Postal Service in this case. See Kokinda, 497 U.S. at 730 (plurality opinion); Ridley, 390 F.3d at 76; Monterey County Democratic Cent.

-28-

Comm., 812 F.2d at 1197-98; Belsky, 799 F.2d at 1489 n.8; Bjerke, 796 F.2d at 649-50.

B.        The Reasonableness of the Regulation

Although the Pittsfield Post Office sidewalk is a non-public forum, the regulation must still be both viewpoint neutral and reasonable to be constitutional. Ridley, 390 F.3d at 82; Kinton, 284 F.3d at 20. The regulation, which bars election campaigning regardless of the identity of the candidate or the opinions he or she espouses, is clearly viewpoint neutral. See Ridley, 390 F.3d at 82 (defining the "essence of viewpoint discrimination" as "a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic"); see also Longo II, 983 F.2d at 12; Monterey County Democratic Cent. Comm., 812 F.2d at 1198; Belsky, 799 F.2d at 1489. We thus turn to its reasonableness.

The reasonableness standard for a viewpoint-neutral restriction in non-public forum "is not a particularly high hurdle." Ridley, 390 F.3d at 90; see also Int'l Soc'y for Krishna Consciousness, 505 U.S. at 683. Indeed, "[t]he Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808. In light of all the circumstances, we find the regulation in this case is more

than merely reasonable. See Longo II, 983 F.2d at 12; Longo I, 953 F.2d at 794-95.

The reasonableness of a regulation is weighed "in light of the purposes served by the forum." Ridley, 390 F.3d at 82; see also Kinton, 284 F.3d at 20. "The purpose of the forum in this case is to accomplish the most efficient and effective postal delivery system," Kokinda, 497 U.S. at 732 (plurality opinion), by providing access to post office customers.

The Postal Service's stated rationale for disallowing election campaigning on its sidewalks is "to prevent abuses and to preclude any appearance of partisan endorsement or preference." Conduct on Postal Property, 43 Fed. Reg. at 38,824; see also Longo I, 953 F.2d at 794.[8]

It is well-established that a politically neutral government entity's interest in avoiding the appearance of political entanglement is a valid justification for limiting speech in a non-public forum. Cornelius, 473 U.S. at 809 ("[A]voiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum."); Greer, 424 U.S. at 839 (upholding the military's regulation banning certain political campaigning activities within the Fort Dix Military Reservation on

---

[8] A different regulation, 39 C.F.R. § 232.1(e), bans "[d]isturbances," such as "conduct which . . . impedes or disturbs the general public in transacting business or obtaining the services provided on [postal] property." Plaintiff's brief does not discuss this separate regulation.

the grounds that the restriction was reasonably justified by the need to keep the military "insulated from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates"); Longo I, 953 F.2d at 794-95; Monterey County Democratic Cent. Comm., 812 F.2d at 1199; see also Berner v. Delahanty, 129 F.3d 20, 27 (1st Cir. 1997).

This justification is particularly weighty given the history of the Postal Service and its problematic historical associations with partisan politics. The Postal Service could reasonably conclude that in order to fulfill its mandate of maintaining an efficient, nationwide system of postal services, see 39 U.S.C. § 403(b)(1), and in order to be viable as a business in an increasingly competitive market, it would need to shed its past image of an institution affiliated with particular candidates or parties and not regain such an image. See Longo I, 953 F.2d at 794-95; Monterey County Democratic Cent. Comm., 812 F.2d at 1199.

Moreover, as the Second Circuit recognized in Longo I, if campaigning for electoral office were permitted on Postal Service property, most likely there would be competition among vying candidates for use of that space, and the Postal Service would have to regulate the usage, which would involve choosing among candidates. Longo I, 953 F.2d at 794. This is the type of engagement which Congress wants the Service to avoid. Id. The interests served by the restriction are analogous to the Hatch

Act's command that federal employees refrain from playing a role in any political campaign activities.  Id. at 795.  The Postal Service has an entirely legitimate reason to avoid being placed in this position, and in light of this history and the purposes of the postal sidewalk, the Service's restriction on campaigning is more than reasonable.

Del Gallo argues that the defendants must justify the regulations by producing evidence that a postal patron, or anyone else, upon seeing plaintiff campaigning on the Pittsfield Post Office sidewalk, would conclude that the Postal Service endorses plaintiff's candidacy.  But the avoidance of the appearance of political association involves a broader set of interests, which are not limited to endorsement.

Further, Del Gallo uses an incorrect legal test.  In Perry, the Supreme Court rejected the argument that a regulation was unreasonable because "there [was] no showing in the record of past disturbances . . . or evidence that future disturbance would be likely."  Perry, 460 U.S. at 52 n.12.  The Court stated that it had "not required that such proof be present to justify the denial of access to a non-public forum on the grounds that the proposed use may disrupt the property's intended function."  Id.; see also Cornelius, 473 U.S. at 810 ("[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum."); cf. Curran v. Cousins, 509 F.3d 36, 49 (1st Cir. 2007) (holding that a

government employer "need not show an actual adverse effect" or wait for actual disruption or harm to occur before terminating an employee under the Garcetti/Pickering test).

Moreover, the reasonableness of the regulation is not judged solely by reference to plaintiff's particular activity. Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 296-97 (1984). Rather, we must consider the effect of political candidates campaigning for election on postal service-identified sidewalks across the country. See Longo I, 953 F.2d at 794; see also Council of Greenburgh Civic Ass'ns, 453 U.S. at 133 ("If Congress and the Postal Service are to operate as efficiently as possible a system for the delivery of mail which serves a Nation extending from the Atlantic Ocean to the Pacific Ocean, from the Canadian boundary on the north to the Mexican boundary on the south, it must obviously adopt regulations of general character having uniform applicability throughout the more than three million square miles which the United States embraces."). Particularly in light of its history and Congress's mandate, the Postal Service's regulation is a reasonable response.[9]

_____

[9]    In Grace, the Supreme Court, while again recognizing that seeking to avoid the appearance of improper influence is a valid governmental concern, found that this goal was not sufficiently furthered by a restriction on the sidewalks surrounding the Supreme Court building; because these sidewalks were completely indistinguishable from the surrounding municipal sidewalks, the Court "doubt[ed] that the public would draw a different inference from a lone picketer carrying a sign on the sidewalk around the building than it would from a similar picket on the sidewalks

Plaintiff has another category of arguments. He argues that even if the Postal Service's stated rationale were reasonable on its own, the regulation still is not reasonable when viewed in the context of other activities which are allowed, such as the activity of requesting signatures for ballot initiatives. Del Gallo argues that if the Postal Service is concerned about the appearance of political entanglement, it is not reasonable that it would ban campaigning for office while allowing people to advocate on its sidewalks for even the most controversial initiatives.

Plaintiff's argument turns the law of non-public fora on its head by creating incentives for all-or-nothing access, with no room between. If accepted, it could lead to unnecessary curtailment of speech. "In a non-public forum, the reasonableness standard is satisfied as long as there is a plausible basis for distinguishing between restricted activities and allowed activities." Kinton, 284 F.3d at 24. The Postal Service has at least a plausible basis for distinguishing between a candidate's own election campaigning and campaigning for ballot initiatives, especially in light of the particular historical problems with which Congress was concerned in passing the Postal Reorganization Act. Ballot initiatives, no matter how controversial, are focused

---

across the street." Grace, 461 U.S. at 183. This logic does not apply to the present case, however, since the much shorter Postal Service sidewalk is obviously distinguishable from the surrounding municipal sidewalks and can be identified with the post office.

on issues.  Initiatives do not raise the same concerns over the appearance of partisan political entanglement, favoritism toward a candidate, or possible patronage.  Such "common-sense," plausible distinctions are "sufficient . . . to uphold a regulation under reasonableness review."  Kokinda, 497 U.S. at 734-35 (plurality opinion) (citation omitted) (quoting Heffron, 452 U.S. at 665 (Blackmun, J., concurring in part and dissenting in part)) (internal quotation marks omitted); see also Berner, 129 F.3d at 28-29.

Acceptance of plaintiff's argument would create a Catch-22 under the First Amendment for the Postal Service.  The Postal Service has determined that it can adequately address its concerns by limiting some forms of political expression on its property while permitting other forms.  Under plaintiff's reasoning, the Service's attempt to allow some expressive activity in this non-public forum would be treated as evidence of unreasonableness under the First Amendment.  The Supreme Court has identified the flaw in this type of reasoning.  See Kokinda, 497 U.S. at 733 (plurality opinion) ("If anything, the Service's generous accommodation of some types of speech testifies to its willingness to provide as broad a forum as possible, consistent with its postal mission. The dissent would create, in the name of the First Amendment, a disincentive for the Government to dedicate its property to any speech activities at all.").  The Postal Service should not be

found to have violated the First Amendment precisely because it attempted to tailor its restriction more narrowly. Moreover, in the context of this non-public forum, the reasonableness of the restriction is enhanced by the availability of alternative public forums for expression very close by. Bjerke, 796 F.2d at 650. Plaintiff was free to campaign on the municipal sidewalks, just a few feet away and easily visible from the Postal Service sidewalk.

C.        Del Gallo's Selective Enforcement Argument

A regulation that is viewpoint neutral and reasonable is nonetheless unconstitutional if it is enforced in a manner that "prefer[s] the message of one speaker over another." McGuire, 386 F.3d at 62; see also Thomas v. Chi. Park Dist., 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional . . . ."). Plaintiff makes a two-part argument: that before his arrest in April 2004, the Pittsfield Post Office had allowed numerous other candidates for political office to campaign on its sidewalks, and that it only enforced the regulation against him because of his controversial views.

Plaintiff's selective enforcement claim is based on events that occurred before his arrest in April 2004, since in the years following plaintiff's arrest, it is uncontested that the regulation has been consistently applied.

At the very least, in order to win such a challenge, plaintiff would need to show "a pattern of unlawful favoritism." McGuire, 386 F.3d at 64 (quoting Thomas, 534 U.S. at 325) (internal quotation marks omitted); see also id. at 63 (suggesting that a showing of invidious intent by the enforcers may also be necessary). The undisputed evidence does not support plaintiff's claim on either ground. The postal sidewalk had been used for political campaigning activities prior to plaintiff's arrest in 2004 (although it is unclear how frequently). And the regulation was enforced inconsistently: some candidates were allowed to campaign on the Pittsfield Post Office sidewalk, while others were told they could not, depending on which Postal Service employee was involved in supervising the sidewalk. Notably, however, at least two candidates besides plaintiff had been asked to move their campaigning to the municipal sidewalk; and one of the candidates who was allowed to campaign on the sidewalk was plaintiff himself. Thus, drawing all reasonable inferences in Del Gallo's favor, the evidence of a pattern of "favoritism" remains insufficient as a matter of law. See McGuire, 386 F.3d at 64-65; see also Clark, 468 U.S. at 295 n.6; Desyllas v. Bernstine, 351 F.3d 934, 944 (9th Cir. 2003).

## III.

The judgment of the district court is affirmed.