TORRUELLA, Circuit Judge
(Concurring in part and Dissenting in part).
I join the majority in affirming the dismissal of the plaintiffs’ claims on standing and res judicata grounds, but disagree with its treatment of the plaintiffs’ claim concerning the Town’s website. The majority concludes that the Town’s rejection of the plaintiffs’ request to put a link to their organization on the Town’s website constitutes government speech not subject to the First Amendment. I disagree with this holding, and have significant qualms with the consequences of the majority’s extension of the government speech doctrine to this case. Moreover, because I believe that there are disputed issues of material fact with respect to whether the Town intended to create a public forum on its website and regarding whether the Town engaged in viewpoint discrimination, I further dissent from the panel’s conclusion on these two issues.
A. Government Speech
The majority holds that the Town’s website, and the Town’s rejection of the plaintiffs’ request to add a link to their organization on that website, constitute government speech not subject to the First Amendment. In support of this position, the government cites the Supreme Court’s recent decision in Pleasant Grove City v. Summum, — U.S. —, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). .As discussed in the majority opinion, Summum concerned a public park that contained permanent monuments privately donated by third parties. Summum, a religious organization, sought to add a permanent monument to the park espousing its views,[14] but the city rejected this request, claiming inter alia that “its practice was to limit monuments in the Park to those that ‘either (1) directly relate to the history of Pleasant Grove, or (2) were donated by groups with longstanding ties to the Pleasant Grove community.’ ” Id. at 1130 (citations and quotation marks omitted). The following year the city “passed a resolution putting this policy into writing.” Id. The Supreme Court held that “[pjerma-nent monuments displayed on public property typically represent government speech,” and that, as such, the city’s actions were not subject to the Free Speech Clause. Id. at 1132.
The majority relies on Summum for the proposition that “when the government uses its discretion to select between the speech of third parties for presentation through communication channels owned by *336 the government and used for government speech, this in itself may constitute an expressive aet by the government that is independent of the message of the third-party speech.” (Op. at 330). Indeed, as the majority notes, the Supreme Court has upheld a number of instances of governmental discrimination of third-party speech as part and parcel of government speech, from “a public library’s exercise of judgment in selecting the material it provides to its patrons,” see United States v. Am. Library Ass’n, 539 U.S. 194, 205, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003), to a public broadcaster’s “selection and presentation of’ debate participants. See Ark. Educ. Television Comm’n v. Forbes, 523 U.S. 666, 673, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998).
In the present case, the majority holds that the Town’s actions constitute “government speech” because the Town “establish[ed]” a website “to convey information about the Town to its citizens and the outside world, and by choosing only certain hyperlinks to place on that website, communicated an important message about itself.” (Op. at 330-31). Moreover, the majority reasons that, as in Summum, the Town similarly did not adopt an express policy concerning what links it would put on its website until after it had rejected the plaintiffs’ speech. See 129 S.Ct. at 1134. Following Summum, the majority views the ex post adoption of a policy as “further evidence that the city was effectively controlling its message.” (Op. at 332). Finally, and although the plaintiffs dispute this, the majority concludes that the Town, prior to its written policy, had an “unwritten policy of only adding links that ‘would promote providing information about the Town,’ while refusing to add links that were ‘political or advocatefd] for certain candidates.’ ” (Id. (emphasis added)).
I disagree that the government speech doctrine necessarily applies to this case. The Court in Summum emphasized that “[tjhere may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech.” 129 S.Ct. at 1132. I believe that this is such a case. As I argue below, there is a disputed issue of material fact over whether the Town’s actions constituted government speech or, as the plaintiffs contend, the designation of a public forum as a result of the opening up its website to outside links. There is also a disputed issue of material fact over whether the Town engaged in viewpoint discrimination.
This case also differs from Summum in two other important respects. Although Summum similarly involved an unwritten policy of exercising discretion, the Sum-mum Court also relied upon the history of privately donated monuments to support its conclusion that “the general government practice with respect to donated monuments has been one of selective receptivity.” Id. at 1133. There is no such history to support the Town’s practice here. The Summum Court further noted, in response to “the legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint,” that formal adoption by the city of the “message” contained in privately donated monuments was not necessary, since the city’s taking of ownership of the monuments “provided a more dramatic form of adoption than the sort of formal endorsement that respondent would demand.” Id. at 1134. Unlike in Summum, there were no actions taken by the Town with respect to third party links that mirrors the “dramatic form of adoption” that occurs when a Town takes ownership of a privately-donated monument. The majority claims that the Town’s acceptance of *337 links is more direct than assuming ownership of a privately donated monument, but does not explain why.
What is lacking in this “recently minted” area of the law, see Summum, 129 S.Ct. at 1139 (Stevens, J., concurring), are any limiting principles. The majority extends the discrimination-as-government-speech doctrine to links on a government website. At least one case, pre-Summum, has also taken that route, although in that case it was clear that the government was engaging in its own speech activity. See Page v. Lexington Cty. Sch. Dist. One, 531 F.3d 275 (4th Cir.2008) (holding, among other things, that selection of links on a school website constituted government speech where the school board only added to its site third party links in support of the board’s opposition to a pending bill). By contrast, in the present case the majority extends the doctrine to a situation where, in my view, it was not clear that the government was engaging in speech at the time it was acting, and only justified its actions after the fact. The majority’s position has the potential of permitting a governmental entity to engage in viewpoint discrimination in its own governmentally-owned channels so long as the governmental entity can cast its actions as its own speech after the fact. What is to stop a governmental entity from applying the doctrine to a parade? Cf. Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston, 515 U.S. 557, 574, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (holding that state public accommodations law could not mandate inclusion of groups into parade, as parade was expressive conduct, and “like a composer, the [parade organizer] selects the expressive units of the parade from potential participants”). Or official events? See Weise v. Casper, No. 05-02355, 2008 WL 4838682 at *8 (D.Colo. Nov.6, 2008) (applying government speech doctrine to dismiss claim that plaintiffs’ free speech rights were violated when they were prevented from attending a speech given by the President because the plaintiffs’ truck contained a bumper sticker stating “No More Blood for Oil”). It is nearly impossible to concoct examples of viewpoint discrimination on government channels that cannot otherwise be repackaged ex post as “government speech.”
The majority claims that there may be limits to the doctrine, “as to the criteria used when the government chooses to provide hyperlinks to particular private speech and not other private speech.” (Op. at 331). I believe that this is one of those cases, and, as I argue below, there is sufficient evidence in this case of viewpoint discrimination to permit the issue to go before a jury.
The majority further claims that “there are certainly other restraints on the government in a case such as this.” (Op. at 331 n.9). It contends in a footnote that “Ei]f the voters do not like those in governance or their government speech, they may vote them out of office,” or, as suggested in Summum, “limit the conduct of those officials ‘by law, regulation, or practice.’ ” (Id. at 331 n.9 (quoting Summum, 129 S.Ct. at 1132)).[15] But even this remote avenue for relief through political processes becomes further constrained by expanding the government’s ability to silence opposition by narrowing the fora in which opposing views may be expressed. Indeed, in permitting the government to use *338 its governmentally-owned channels to silence its critics in the name of “government speech,” the government speech doctrine, as interpreted by the majority, puts individuals who oppose the government and its actions at a structural disadvantage. This is akin to allowing the government “to fight freestyle, while requiring the other [side] to follow Marquis of Queensberry rules.” R.A.V. v. City of St. Paul, 505 U.S. 377, 392, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).[16]
B. Public Forum
The majority further concludes that the Town’s actions with respect to its website could not be interpreted as designating the website as a public forum. I disagree. The majority’s concludes that “there is absolutely no evidence that the Town ‘intentionally open[ed] a nontraditional forum for public discourse.’ ” (Op. at 333 (quoting Del Gallo v. Parent, 557 F.3d 58, 72 (1st Cir.2009))).[17] In doing so, it rejects the plaintiffs’ claim that the Town’s inclusion of a link to “Speak Up, Epping” (“SUE”) at least indicated that “there were no clear standards for exclusion or inclusion of third-party links on its website.” (Id. at 333); see also Ridley v. MBTA, 390 F.3d 65, 104 (1st Cir.2004) (Torruella, J., concurring in part and dissenting in part) (“Courts will hold that the government did not create a public forum only when its standards for inclusion and exclusion are clear ....”) (citation and quotation marks omitted). But there were, in fact, no such clear standards. As the undisputed facts demonstrated, the Town did not adopt any formal policy with respect to links on its website until after the plaintiffs’ sought to include its request. In fact, at oral argument the Town could not provide a definition of what that policy was, running through various definitions.
The majority points to the Town’s purported “unwritten policy of only adding links that ‘would promote providing information about the Town,’ while refusing to add links that were ‘political or advocate[d] for certain candidates,’ ” (Op. at 332), but the plaintiffs vigorously disputed the existence of such a policy, and pointed to the addition of the SUE link as evidence of a willingness to add outside links without such preconditions.[18] While the majority concludes that the addition of the SUE *339 link did not contradict the Town’s unwritten policy, I disagree. In the absence of a written, publicly available policy, one could reasonably infer from the Town’s inclusion of the SUE link, without any public process detailing the conditions of inclusion, that it was willing to open up its website to outside links. See Ridley, 390 F.3d at 104 (Torruella, J., concurring in part and dissenting in part) (“In determining whether the government has designated property to be a public forum, we have previously stated that ‘actual practice speaks louder than words.’ ” (quoting Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5, 941 F.2d 45, 47 (1st Cir.1991))).[19] Given this reasonable inference of the Town’s actions, I would have permitted the jury to address this question of intent, rather than affirm the grant of summary judgment here. See Noonan v. Staples, 556 F.3d 20, 31 (1st Cir.2009) (“[Wjhere ‘motive and intent play a leading role, summary judgment should not be granted.’ ”) (citation omitted).
I further disagree with the majority’s conclusion that “the public forum doctrine is not a natural fit for the issues raised in this case.” (Op. at 334). I agree with the majority that forum analysis “should not be extended beyond the context in which ‘the open access and viewpoint neutrality commanded by the doctrine is compatible with the intended purpose of the property.’ ” (Op. at 334 (quoting Forbes, 523 U.S. at 672-73, 118 S.Ct. 1633)). However, the majority’s reasoning for why it should not be extended to this context takes too limited view of what can be accomplished on the web.
The majority writes that converting the Town website into a public forum “could risk flooding the Town website with private links, thus making it impossible for the Town to effectively convey its own message, and defeating the very purpose of the website and the hyperlinks chosen by the Town.” (Op. at 334). It further argues that this flood of third party links may force the Town to take down its website altogether.
I see no reason why this would have to be the case. Unlike a physical space, where there are limitations on the amount of speakers it can contain, the Town’s website can accommodate a near infinite number of links, save for minimal storage and server costs. Moreover, there is no reason why a Town cannot, consistent with viewpoint neutrality, impose time, manner, and place restrictions which could contain the flood of private links the majority imagines will result from opening up the Town’s website to third parties. In fact, consistent with the government speech doctrine, the Town could engage in preferential treatment of its own speech on the website while accommodating the speech of others. And although, as correctly noted by the majority, a citizen can find another outlet on the internet to express its views, there is a significant benefit to public debate in allowing a citizen to express his or her views in the same place as the government. To force a citizen to express his or her views elsewhere on the internet would be akin to banishing a citizen from making his views known in city hall, but instead on a street corner outside the building.
C. Viewpoint Discrimination
The majority finally asserts that this is not a case of viewpoint discrimination, not *340 ing that SUE was an event which had received Town approval, did not have a viewpoint, and that the link to SUE was from a governmental website. But what is important is not the status of SUE, but whether the Town’s actions in including a link to SUE and then, abruptly, rejecting a similar request by the plaintiffs can support a claim of viewpoint discrimination. The timing of these events, combined with the lack of any clear policy to support the Town’s actions and the evident animosity between the plaintiffs and the Town all at least raise an inference of viewpoint discrimination sufficient in my view to at least put the issue before the jury.[20]
For all of the above reasons, I respectfully concur in part and dissent in part.

. The proposed monument would contain the “Seven Aphorisms of SUMMUM,” which are "[cjentral to Summum religious belief and practice.” Id. at 1129-30 & n. 1.

. The majority also points to the Establishment Clause as limiting government speech, which has no application here, and to the Equal Protection Clause, which the plaintiffs unsuccessfully invoked here. See Summum, 129 S.Ct. at 1139 (Stevens, J., concurring) (mentioning the Establishment Clause and the Equal Protection Clause as other “constitutional safeguards [that] ensure that the effect of today's decision will be limited.”).

.In my view, the better course is to adopt the test proposed by Justice Souter in his concurrence to Summum. Although he joined the majority in that case, he further noted that:
To avoid relying on a per se rule to say when speech is governmental, the best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige by allowing the monument to be placed on public land.
Summum, 129 S.Ct. at 1142 (Souter, J., concurring). Justice Souter's test has the benefit of preventing ex post rationalization of viewpoint discrimination as government speech to avoid First Amendment scrutiny. Rather, the actions of the government would be evaluated from the perspective of a reasonable observer, and, as I note below, it is an open question whether a reasonable observer would construe the Town’s actions as government speech, as opposed to the designation of a public forum or simple run-of-the-mill viewpoint discrimination.

. It goes without saying that I agree with the majority’s conclusion that the Town's website is not a traditional public forum. See Int’l Soc’y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (defining a "traditional public forum” as one that has " 'immemorially ... time out of mind’ been held in the public trust and used for purposes of expressive activity”) (omission in original).

. In fact, the very name given to this event, "Speak Up, Epping,” shows that the Town sought to encourage participation in civic discourse, yet the Town proceeded to exclude the plaintiffs' participation.

. Although the majority notes, correctly, that the plaintiffs only relied upon the inclusion of the SUE link in support of their claims, at oral argument the Town admitted that it permitted the inclusion of links of other organizations, namely the Chamber of Commerce, that took " 'political' " stances. It is unclear why we are required to ignore such evidence on an issue of such constitutional importance.

. I further cannot ignore the fact that, at oral argument, counsel for the Town struggled to justify the Town's inclusion of a Chamber of Commerce link on the Town's website, but not the plaintiffs' website.